R.F.M.A.S., INC., Plaintiff,

v.

Mimi SO, et al., Defendants.

No. 06 Civ. 13114(VM)(MHD).

United States District Court,
S.D. New York.

Oct. 12, 2010.

Kenneth S. Feldman, Law Offices of Stephen E. Feldman, P.C., Stephen Edward Feldman, Paul J. Burgo, Steven Michael Crosby, Feldman Law Group, New York, NY, Kevin P. Crosby, Brinkley, Morgan, Solomon, Tatum, Stanley, Lunny & Crosby, Fort Lauderdale, FL, Theodore C. Anderson, Kilgore & Kilgore, PLLC, Dallas, TX, for Plaintiff.

Deepro R. Mukerjee, Victoria Elizabeth Spataro, Alston & Bird, LLP, Alexander Lloyd Greenberg, Richard Zachary Lehv, Fross Zelnick Lehrman & Zissu, P.C., New York, NY, Martin J. Elgison, Alston & Bird LLP, Atlanta, GA, Barry George Magidoff, Sutton Magidoff, LLP, New York, NY, for Defendants.

## DECISION AND ORDER

VICTOR MARRERO, District Judge.

Plaintiff R.F.M.A.S., Inc. ("RFMAS") objects to a Report and Recommendation issued by Magistrate Judge Michael H. Dolinger, granting in part and denying in

part defendants' motion to exclude at the trial of this action the testimony of plaintiff's experts. For the reasons stated below, the Court adopts the recommendations of Judge Dolinger's report in their entirety.

## I. BACKGROUND

RFMAS brought this action against defendants Mimi So, Mimi So International, Inc., Richemont SA, Compagnie Financière Richemont SA, Richemont North America, Richemont Holdings I, and Richemont International, Ltd. (collectively, "Defendants"), alleging, among other things, that Defendants infringed RFMAS's copyright in nine pieces of its "Stella" jewelry line and infringed the trade dress of the "look" of the Stella collection.

On August 30, 2010, Magistrate Judge Dolinger, to whom this matter had been referred for supervision of pretrial proceedings, issued a Report and Recommendation (the "Report"), a copy of which is attached and incorporated herein, recommending that Defendants' Motion to Exclude Plaintiff's Experts dated December 1, 2009 (the "Motion") be granted in part and denied in part.

Specifically, the Report recommended that RFMAS's experts Don Smith ("Smith") and Steve Hansen ("Hansen") be precluded from testifying at trial as to whether Defendants' actions damaged RFMAS and, if so, to what extent. However, the Report deemed potentially admissible a limited portion of Hansen's testimony regarding whether the jewelry featured in Mimi So's 2006 "Gate B9" catalogue "would only be sold precisely as is depicted." (See Report at 95–96.) Consequently, the Report recommended that the entirety of Smith's expert reports and the relevant portions of Hansen's expert reports be stricken.

Further, the Report recommended that RFMAS's experts Joyce Jonas ("Jonas") and Edward Lewand ("Lewand") be permitted to offer testimony regarding the similarities and differences between RFMAS's and Defendants' jewelry. However, the Report recommended that these individuals be precluded from offering expert opinions as to the "probable effect in the market" of RFMAS's Stella line, the distinctiveness of RFMAS's line, whether or not the Stella line operates as a source identifier and constitutes a protectable trade dress, whether customers are likely to be confused about the source of Defendants' jewelry, and whether Defendants' jewelry was copied from RFMAS's. The Report recommended that the portions of Jonas's and Lewand's reports corresponding to these latter issues be stricken.

On September 27, 2010, RFMAS filed timely objections to the Report (the "Objections") challenging certain of the Report's findings.

## II. LEGAL STANDARD [1]

■ Pre-trial discovery issues in civil litigation are generally considered non-dis-

---

**1.** Although Magistrate Judge Dolinger characterized his ruling as a Report and Recommendation, for the purposes of the applicable standard of review this Court considers the relevant inquiry, consistent with the plain text of 28 U.S.C. § 636(b)(1)(A) and Federal Rule of Civil Procedure 72(a), to be whether the pretrial matter at issue is "dispositive of a party's claim or defense," rather than how a magistrate judge styles his decision. Fed. R.Civ.P. 72(a); see also Gomez v. U.S., 490 U.S. 858, 873–74, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989); Kiobel v. Millson, 592 F.3d 78, 85 (2d Cir.2010) (Cabranes, C.J., concurring). While the Court applies the "clearly erroneous or contrary to law" standard in evaluating the Report, it also considers that even reviewing the issues presented under the standard of de novo review that governs a magistrate judge's determination on a dispositive matter, the Court's decision here would be no different.

positive matters. *See Thomas E. Hoar, Inc. v. Sara Lee Corp.,* 900 F.2d 522, 525 (2d Cir.1990); *MacNamara v. City of New York,* 249 F.R.D. 70, 77 (S.D.N.Y.2008); *see also* 12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice & Procedure § 3068.2 (2d ed. 2010). In evaluating a magistrate judge's findings regarding non-dispositive issues such as pre-trial disputes, a district court may modify or set aside a determination only if it is found to be "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); *see also* Fed.R.Civ.P. 72(a). A finding is "clearly erroneous" if the reviewing court is "left with the definite and firm conviction that a mistake has been committed." *Easley v. Cromartie,* 532 U.S. 234, 242, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001) (*quoting United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). Similarly, a finding is contrary to law "when it fails to apply or misapplies relevant statutes, case law, or rules of procedure." *Catskill Dev., LLC v. Park Place Entm't,* 206 F.R.D. 78, 86 (S.D.N.Y.2002) (internal quotations omitted). Therefore, pursuant to these standards, a magistrate judge's determinations on discovery matters are entitled to substantial deference. *U2 Home Entm't, Inc. v. Hong Wei Int'l Trading Inc.,* No. 04 Civ. 6189(JFK), 2007 WL 2327068, at *1 (S.D.N.Y. Aug. 13, 2007) (*citing Nikkal Indus., Ltd. v. Salton, Inc.,* 689 F.Supp. 187, 189 (S.D.N.Y.1988)) ("Consistently, it has been held that a magistrate's report resolving a discovery discourse between litigants should be afforded substantial deference and be overturned only if found to be an abuse of discretion."). "The party seeking to overturn a magistrate judge's decision thus carries a heavy burden." *Id.* (*citing Catskill Dev.,* 206 F.R.D. at 86).

## III. DISCUSSION

The Court has reviewed the full factual record in this litigation pertaining to the issues raised by RFMAS's objections, including the pleadings and the parties' respective papers submitted in connection with the underlying motion to exclude RFMAS's experts, as well as the Report and applicable legal authorities. On the basis of this review, the Court concludes that the findings, reasoning, and legal support for the recommendations made in the Report are neither clearly erroneous nor contrary to law. The Report carefully details the backgrounds, assumptions, methodologies and findings of each of RFMAS's experts and evaluates them in light of the standards for admissibility of expert testimony set out by Rule 702 of the Federal Rules of Evidence, *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The Court finds that the Report's recitation accurately reflects the factual record and that its legal analyses and determinations are sound.

Rule 702 of the Federal Rules of Evidence provides that a qualified expert's testimony is admissible only "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. In assessing the reliability of expert testimony, the trial court must decide not only whether an expert's methodology is reliable for some purposes, but whether it is a reliable way "to draw a conclusion regarding the particular matter to which the expert testimony was directly relevant." *Kumho Tire Co.,* 526 U.S. at 154, 119 S.Ct. 1167. Expert testimony that is merely "subjective belief or unsupported speculation" should be excluded.

*Daubert,* 509 U.S. at 590, 113 S.Ct. 2786. The party proffering the expert has the burden to demonstrate that its expert witness satisfies these criteria. *See, e.g., Zaremba v. GMC,* 360 F.3d 355, 358 (2d Cir.2004).

In its Objections, RFMAS first contends that, contrary to the findings of the Report, the data relied upon and methods employed by its damages experts Smith and Hansen were both sufficient and sound. Specifically, RFMAS argues that Smith and Hansen (1) investigated sufficiently the reasons for the decline in RFMAS's business with Neiman Marcus; (2) considered alternative causes for the decline in RFMAS's Neiman Marcus business other than Defendants' alleged infringement; (3) were not required to apportion damages between the causes of action and the parties;[2] (4) used commonly accepted and justifiable financial projection methods to calculate lost profits and diminished enterprise value; and (5) properly extrapolated from RFMAS's sales at Saks Fifth Avenue ("Saks") to project RFMAS's lost sales at Neiman Marcus. Additionally, RFMAS objects that the Report incorrectly found Smith and Hansen, as well as RFMAS's liability experts Jonas and Lewand, lacking in certain qualifications relevant to their proposed testimony as experts. The Court will address each of these objections in turn.

As to RFMAS's objections regarding the methods employed by Smith and Hansen, the Court concurs with the Report's findings and conclusions substantially for the reasons discussed therein. First, the Court disagrees with RFMAS's apparent argument that Smith and Hansen did not fail to investigate the reason for the decline in RFMAS's Neiman Marcus business because the deposition testimony of Neiman Marcus representative Lisa Kazor ("Kazor") rendered the cause self-evident. (*See* Objections at 5–7.) Kazor's testimony quoted by RFMAS in its Objections discusses both upward and downward trending of RFMAS's sales to Neiman Marcus over time, does not explain the reasons for that trending, and makes no mention whatsoever of Defendants or their products. RFMAS's attempts to "fill in the blanks" of this testimony with unsupported factual assertions is unavailing. Further, RFMAS's curious assertion that "there was simply no basis for a *second* deposition of Neiman Marcus conducted *by experts,* as posited in the Report," (Objections at 7) (emphasis in original) misses the point; the Report concluded that RFMAS's counsel could have questioned Kazor directly at her deposition as to the reasons for the decline but apparently chose not to do so, and further noted that, in any event, Smith did not even read Kazor's testimony. (*See* Report at 59–60 and n.44.)

Next, RFMAS's claim that, contrary to the conclusion of the Report, Smith and Hansen sufficiently considered alternative causes for the decline in RFMAS's Neiman Marcus sales is based solely on a reference

---

**2.** With regard to apportionment, RFMAS objects that the Report "baselessly criticized" Smith and Hansen for "not apportioning the damages (or separating the harms) between the causes of action and the parties." (Objections at 9.) However, the Report merely noted that since Smith's and Hansen's reports did not distinguish between the liability of the co-defendants or separate the harms flowing from individual legal violations, their reports "would be of limited utility" and would be "helpful to determining damages only if all Defendants were found jointly and severally liable on every cause of action alleged." (Report at 47–48.) Consequently, as the Report made no actual finding with respect to Smith's and Hansen's failure to apportion damages and instead concluded for other reasons that those experts' reports should be stricken, the Court need not address this issue.

to a factual recitation contained in the Report itself. (*See* Objections at 8.) Yet the portion of the Report to which RFMAS cites observed—correctly in the Court's opinion—that Smith and Hansen made only conclusory assertions that they failed to find evidence to support several other theories of causation.[3] (*See* Report at 60, 62 and n.41.) RFMAS fails to identify any other evidence supporting its objection on this point, and consequently, the Court rejects this claim.

RFMAS's argument that Smith's and Hansen's methodologies are generally accepted practices similarly misses the mark. Even were the Court persuaded—which it is not—that the models chosen by RFMAS's experts to forecast lost profits and lost enterprise value were reasonable in general, RFMAS would still fail to meet its burden. RFMAS must show not only that its experts' methodologies are reliable for some purposes, it must also show that those methodologies are reliable ways "to draw a conclusion regarding the particular matter to which the expert testimony was directly relevant." *Kumho Tire Co.*, 526 U.S. at 154, 119 S.Ct. 1167. Here, as the Report concludes, RFMAS's experts "have utterly failed to justify their chosen methodologies in light of the facts of this case."[4] (Report at 65.)

Additionally, RFMAS's arguments with respect to its experts' qualifications are either immaterial or irrelevant. First, even if RFMAS were correct that Smith possesses the requisite qualifications to project revenues, that would not change the fact that, as noted above and in the Report, Smith failed to demonstrate that he employed a reliable method in doing so. RFMAS's arguments regarding its other experts fare no better. RFMAS insists that Hansen is qualified to project revenues, yet the Report never found Hansen unqualified in that regard. Finally, RFMAS's arguments regarding Lewand and Jonas fail to recognize a pivotal and utterly unfounded assumption: even if, as RFMAS claims, Jonas's "historical" knowledge of jewelry includes knowledge of the contemporary market, and even if Lewand is an experienced appraiser of contemporary jewelry pieces, that would still not warrant permitting either Jonas or Lewand to testify to ultimate facts in dispute, and thus invade the province of the jury, for instance concerning the distinctiveness or uniqueness of RFMAS's Stella jewelry line, whether customers are likely to be confused about the source of Defendants' jewelry, or whether Defendants' jewelry was actually copied from RFMAS's.

Accordingly, for substantially the reasons set forth in the Report, the Court adopts the Report's factual and legal analyses and determinations, as well as its substantive recommendations in their entirety as the Court's own ruling on Defendants' Motion.

## IV. *ORDER*

For the reasons discussed above, it is hereby

---

3. Notably, in reaching their conclusions on causation Smith and Hansen relied almost exclusively upon materials provided to them by RFMAS's counsel. (*See* Deposition of Don E. Smith, Oct. 2, 2009 ("Smith Dep.") at 97–99; Expert Report of Don E. Smith dated Sep. 15, 2009 ("Smith Report") at 24; Deposition of Steven L. Hansen, Oct. 9, 2009 ("Hansen Dep.") at 108–09; and Expert Report of Steven L. Hansen dated Sep. 14, 2009 ("Hansen Report") at 23.)

4. For this reason, the Court finds RFMAS's argument with regard to the appropriateness of Saks as a comparison in extrapolating damages to be beside the point. Even were RFMAS's sales at Saks a reliable control for projecting RFMAS's lost sales at Neiman Marcus—again, a proposition for which the Court finds little support in the record— RFMAS has still failed to show that Smith's and Hansen's methods were otherwise reliable to project those lost sales.

**ORDERED** that the Report and Recommendation of Magistrate Judge Michael H. Dolinger dated August 30, 2010 (Docket No. 216) is adopted in its entirety, and the Objections of plaintiff R.F.M.A.S. (Docket No. 230) are DENIED.

**SO ORDERED.**

## REPORT & RECOMMENDATION

MICHAEL H. DOLINGER, United States Magistrate Judge:

TO THE HONORABLE VICTOR MARRERO, U.S.D.J.:

Plaintiff R.F.M.A.S., Inc. ("RFMAS" or "plaintiff") is a designer of jewelry sold under the trademark "Faraone Mennella". (Am. Compl. ¶ 13). It commenced this action against Ms. Mimi So and Mimi So International, Inc. (collectively, "the Mimi So defendants" or "Mimi So") and Richemont SA, Compagnie Financiere Richemont SA, Richemont North America, Inc., Richemont Holdings I, Inc., and Richemont International, Ltd. (collectively, "the Richemont defendants") on November 13, 2006. Plaintiff alleges that several pieces in Mimi So's 2006 "Gate B9" collection of jewelry infringed plaintiff's copyright and trade dress on the design of pieces in its "Stella" collection. (*See* Decision & Am. Order, May 13, 2009, at 4, available at *R.F.M.A.S., Inc. v. Mimi So*, 619 F.Supp.2d 39, 47 (S.D.N.Y.2009); Compl. ¶¶ 37–40).[1]

Defendants have moved to exclude the testimony of plaintiff's four putative expert witnesses: Don Smith and Steven Hansen, plaintiff's damages experts, and Joyce Jonas and Edward Lewand, plaintiff's liability experts. Defendants argue that their testimony is inadmissible in whole or in part under Federal Rules of Evidence 403,

702, and 703 and the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). They seek an order striking the Rule 26(a)(2)(B) reports of these witnesses and precluding plaintiff from calling them as expert witnesses at trial.

For the reasons below, we recommend that defendants' motion be granted in part and denied in part. As we explain below, we recommend that the court exclude the expert testimony of Don Smith in its entirety, and exclude the expert testimony of Steve Hansen, Joyce Jonas, and Edward Lewand in part because as to many of the matters on which these witnesses offer testimony, they are either not qualified as experts or have not demonstrated that their conclusions rest on sufficiently reliable methods and facts.

## I. STANDARDS FOR ADMISSIBILITY OF EXPERT TESTIMONY

### A. Federal Rule of Evidence 702, Daubert, and Kumho

■ Expert witness testimony is appropriate only if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue". Fed.R.Evid. 702. In those circumstances, a person who possesses relevant specialized knowledge by virtue of his "skill, experience, training, or education" may testify as an expert witness. *Id.* "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered

---

1. The Richemont defendants are related entities that are implicated in this case because one of the entities held a 40% interest in the stock of Mimi So International from 2003 to

2007. (*See* Am. Compl. ¶¶ 4–8; Answer, Docket # 28, at ¶¶ 4–8); *R.F.M.A.S., Inc.,* 619 F.Supp.2d at 49.

testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir.2004).

Rule 702 of the Federal Rules of Evidence provides that a qualified expert's testimony is admissible only "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. This rule "incorporates the principles enunciated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)[,] in which the Supreme Court held that trial courts have a gatekeeping function to ensure that any and all scientific testimony or evidence admitted is not only relevant but reliable." *Discover Fin. Servs. v. Visa U.S.A., Inc.*, 582 F.Supp.2d 501, 503 (S.D.N.Y.2008) (internal quotations omitted). Subsequent to the Daubert decision, the Supreme Court made clear that the trial court must perform the gatekeeping function outlined in Daubert to determine the admissibility of all expert opinions, not only testimony as to scientific matters. *Kumho Tire Co.*, 526 U.S. at 147, 119 S.Ct. 1167.

■ Under *Daubert* and *Kumho Tire Co.*, the trial court must determine that the proposed testimony of a qualified expert witness "is not only relevant, but reliable." *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786; *Kumho Tire Co.*, 526 U.S. at 137, 119 S.Ct. 1167. This inquiry must focus "not on the substance of the expert's conclusions, but on whether those conclusions were generated by a reliable methodology." *Trouble v. Wet Seal, Inc.*, 179 F.Supp.2d 291, 301 (S.D.N.Y.2001). To the extent that a party questions the weight of the evidence upon which the other party's expert relied or the conclusions generated from the expert's assessment of that evidence, it may present those challenges through cross-examination of the expert. *Park West Radiology v. CareCore Nat'l LLC*, 675 F.Supp.2d 314, 326 (S.D.N.Y.2009) (citing *Discover Fin. Servs.*, 582 F.Supp.2d at 507). Minor flaws in an expert's analysis likewise can be probed through cross-examination and generally go to the weight to be accorded to the expert's testimony rather than admissibility.[2] However, "[w]hen an expert opinion is based on data, a methodology or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Nimely v. City of N.Y.*, 414 F.3d 381, 396–97 (2d Cir.2005) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir.2002)).

■ In assessing the reliability of the expert testimony, the court must undertake a two-step analysis. First, the court must determine, at least on a preliminary basis, "whether the reasoning or methodology underlying the testimony is scientifically valid". *Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786. The *Daubert* Court suggested that for scientific methods, the trial judge should assess whether the method or theory "can be and has been tested." *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786. This includes a consideration of whether the methodology has been subjected to peer review and publication, the degree to which it has been accepted in the relevant profession or discipline, and the known or

---

2. *See, e.g., Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213–14 (2d Cir.2009) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)); *Park West Radiology*, 675 F.Supp.2d at 329 (denying defendants' motion to exclude plaintiff's expert's testimony because expert's methodology was reliable on the whole and defendants could raise their challenges to the applicability of some aspects of the expert's analysis to the case at hand on cross-examination).

potential error rate of the methodology. *Id.* at 593–95, 113 S.Ct. 2786. For methods or theories that are not purely scientific, the court should follow the same general approach, adapting the *Daubert* criteria as needed for the purpose of assessing reliability. *See Kumho Tire Co.,* 526 U.S. at 150, 119 S.Ct. 1167.

■ Second, the court must further decide whether that reasoning or methodology is appropriately applied to the case at hand, and whether the expert is applying it in a manner that ensures a reliable linkage between the facts that he is examining and the conclusions that he is announcing. *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786; *Kumho Tire Co.,* 526 U.S. at 158, 119 S.Ct. 1167. In short, the trial court must decide not only whether the methodology is reliable for some purposes, but also whether it is a reliable way "to draw a conclusion regarding the particular matter to which the expert testimony was directly relevant." *Kumho Tire Co.,* 526 U.S. at 154, 119 S.Ct. 1167. Expert testimony that is merely "subjective belief or unsupported speculation" should be excluded. *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786; *see also Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 311 (2d Cir.2008) (quoting *Boucher,* 73 F.3d at 21). As the Supreme Court has noted in this context:

> Conclusion and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

The party proffering the expert has the burden to demonstrate by a preponderance of the evidence that its expert witness satisfies these criteria. See, *e.g., Zaremba v. GMC,* 360 F.3d 355, 358 (2d Cir.2004); *Aventis Envt'l Science USA LP v. Scotts Co.,* 383 F.Supp.2d 488, 513 (S.D.N.Y. 2005).

## B. *Expert Report Requirements*

The Federal Rules require a party that has designated an expert witness for trial to provide the other side with a report prepared and signed by that witness. Fed.R.Civ.P. 26(a)(2)(B). The report must contain, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them; the data or other information considered by the witness in forming them; any exhibits that will be used to summarize or support them", and "the witnesses' qualifications". Fed.R.Civ.P. 26(a)(2)(B)(i)-(iv).

As this language suggests, the report setting forth the expert's opinions and their factual basis must be "detailed and complete". *See* 1993 Advisory Committee Notes to Fed.R.Civ.P. 26(a)(2)(B), at 160. A party may depose the other side's expert only after the expert provides the required report. Fed.R.Civ.P. 26(b)(4)(A). The drafters of this rule anticipated that the provision of a report would significantly shorten the duration and narrow the scope of depositions of expert witnesses and perhaps in some cases obviate the need for the deposition altogether. *Lava Trading, Inc. v. Hartford Fire Ins. Co.,* 2005 WL 4684238, at *7 (S.D.N.Y. Apr. 11, 2005) (citing 1993 Advisory Committee Notes to Fed.R.Civ.P. 26(a)(2)(B), at 161; *Salgado v. Gen. Motors Corp.,* 150 F.3d 735, 741 n. 6 (7th Cir.1998)). A party that has made a disclosure under Rule 26(a) must supplement or correct its disclosure "in a timely manner if the party learns that in some

material respect the disclosure or response is incomplete or incorrect". Fed.R.Civ.P. 26(e)(1)(a).

Any expert testimony that is not properly supported and disclosed in a report is presumptively inadmissable unless the noncompliance with Rule 26 was "substantially justified" or "harmless". Fed. R.Civ.P. 37(c)(1).[3]

## II. *THE PARTIES' ARGUMENTS*

Defendants argue that plaintiff's putative damages experts, Mr. Smith and Mr. Hansen, are not qualified to opine on causation in this case, and that their testimony on both causation and the measure of damages rests on an insufficient factual record and is the product of an unreliable analytical framework. (Defs.' Mem. Law Supp. Mot. to Exclude Pl.'s Experts, Dec. 1, 2009 ["Defs.' Mem."], at 4–16; Defs.' Reply Mem. Supp. Mot. to Exclude Pl.'s Experts, Dec. 28, 2009 ["Defs.' Reply Mem."] at 2–9). Although defendants focus primarily on Mr. Smith and Mr. Hansen, they also argue that plaintiff's liability experts, Mr. Lewand and Ms. Jonas, are not qualified to opine on many of the matters on which they offer testimony, that they reached their conclusions by way of unreliable methodologies, and that, in any event, no expert testimony on liability is necessary in this case. (Defs.' Mem. at 1, 18–19; Defs.' Reply Mem. at 9–10).

In support of their motion, defendants offer the testimony of two of their own expert witnesses, who in part respond to the testimony of plaintiff's experts. Michelle Riley is a licensed CPA and has been qualified as a damages expert in many federal cases. (*See* Michele M. Riley Report, Oct. 15, 2009, Ex. 10 to Richard Lehv, Esq. Decl., Dec. 1, 2009 ["Riley Report"] at 1 ¶ 1; Ex. 1 to id. (curriculum vitae)). Ms. Riley testified that Mr. Smith's and Mr. Hansen's analyses of plaintiff's damages are speculative because they failed to investigate the facts relevant to determining causation and quantifying the alleged harm and did not support their conclusions with sufficient analysis. (*See* Riley Report at 2–3 ¶ 7). Carolyn Kelly has extensive experience in the fine jewelry industry, including experience in product development, experience working at both retailers and wholesalers, and nine years of service as Divisional Manager of Fine Jewelry for Saks Fifth Avenue. (Carolyn M. Kelly Report, Oct. 14, 2009, Ex. 14 to Richard Lehv, Esq. Decl., Dec. 1, 2009 ["Kelly Report"] at 1). She compared some of plaintiff's and defendants' pieces of jewelry and opined on their similarities and differences from aesthetic and commercial perspectives. (*Id.*). Ms. Kelly concluded that neither the Stella collection nor the Gate B9 collection was unique, that the two lines cater to different consumer markets, and that defendants' Gate B9 collection likely could not have affected plaintiff's business. (*Id.* at 2–4).

Plaintiff responds that defendants have not identified any inaccuracies in the factual record relied upon by its experts, and that its experts' testimony is not rendered inadmissible simply because other experts disagree with their conclusions. Plaintiff further argues that the alleged flaws in its experts' analysis, including the damages

---

**3.** "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard: (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure; (B) may inform the jury of the party's failure; and (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi)." Fed.R.Civ.P. 37(c)(1)(A)-(C).

experts' alleged failure to rule out alternative causes, are minor and do not compel exclusion of their expert testimony. (Pl.'s Mem. Law Opp. Mot. to Exclude, Dec. 18, 2009 ["Pl.'s Mem."] at 1, 6, 17).

We consider these arguments below.

### III. *PLAINTIFF'S DAMAGES EXPERTS*

Plaintiff retained two experts, Don Smith and Steve Hansen, to offer testimony in support of plaintiff's case on damages.[4] Plaintiff asked these experts to assume that all defendants were liable on all causes of action in this case, and to determine whether defendants' collective copyright and trade dress infringement, misappropriation of plaintiff's proprietary information and trade secrets, and breach of contract impacted plaintiff's sales and profits and the value of plaintiff's brand and intellectual property, and if so, what the total amount of damages is. (Don E. Smith Report, Sep. 15, 2009, Ex. 1 to Richard Lehv, Esq. Decl., Dec. 1, 2009 [hereinafter "Smith Report"], at 2; Steven

L. Hansen Report, Sep. 14, 2009, Ex. 2 to Richard Lehv, Esq. Decl., Dec. 1, 2009 ["Hansen Report"], at 3–4).

It appears that Mr. Smith and Mr. Hansen collaborated on their analysis. Smith consulted Hansen before issuing his own opinions, and Smith's and Hansen's reports cite each other.[5] Hansen's report also purports to assess "the applicability and reasonableness of the findings of Don Smith." (Hansen Report at 3). Because their testimony is so inextricably and circularly connected, we will analyze the admissibility of their opinions together.

### A. *Don Smith*

Don E. Smith is the president and primary consultant at a marketing consulting firm that he founded in 1989. (Smith Report at 1, 21). His work as a marketing consultant includes experience "defining market sizes, growth rates, [ . . . and] competitive strengths and weaknesses", and creating strategies to increase market share, sales, and profits. (*Id.* at 21). He states that he has "25 years of experience

4. Mr. Hansen was additionally asked to opine on whether "[j]ewelry that is depicted in catalogs containing prices, weights, and other descriptive information, and mailed to thousands of a national retail chain's customers [is] likely to be sold" in "substantially the same form as offered" in the catalog. (Hansen Report at 1, 4). It appears that this testimony was intended to counter defendants' assertion that some of the items depicted in Mimi So's 2006 Gate B9 catalog were "prototypes or first-run creations which were, for the most part, never sold". (*Id.* at 5). Drawing on his knowledge as to how jewelry is manufactured, advertised, and sold (*see id.* at 4–6), Mr. Hansen concluded that the jewelry featured in Mimi So's 2006 Gate B9 catalog "would only be sold precisely as it is depicted." (*Id.* at 6). Although we infer that defendants wish to strike all of plaintiff's experts' reports in their entirety and preclude them from testifying altogether, neither party discusses this aspect of Mr. Hansen's testimony, and defendants' arguments for excluding the rest of Hansen's testimony do not seem

applicable to this portion. Accordingly, we will treat defendants' motion as not challenging the admissibility of this testimony. We note that, at any rate, in light of developments in this case after the close of expert discovery, Hansen's testimony on this subject may no longer be necessary. (*See generally* Mem. & Order, Aug. 11, 2010, 271 F.R.D. 13, 2010 WL 3322639 (S.D.N.Y.2010)).

5. *See* Smith Report at 2, 3 n.3, 7 & n.21, 8 n.26, 8 n.27, 9 & n.30, 12 n.33, 13 n.37, 14 & n.39, 18 n.47, 18 n.49, 24; Hansen Report at 16; Hansen Dep. at 92 (opining that Neiman Marcus reduced its level of purchases from plaintiff after it began purchasing the Mimi So Gate B9 Collection "[b]ased on [his] review of a chart provided by Don Smith"); *id.* at 144 (reporting that Don Smith wanted to know "how to best make sure that the information that was coming from the plaintiff was reasonable, made sense, and was adequately supported with—with the records, so I helped him out with this approach.").

in the marketing and sales management of Fortune 500 companies" (*id.* at 2), and his resume indicates that he has taught courses in these areas.[6] Mr. Smith also asserts that he has experience involving the development and launch of new products. (*Id.* at 2).

### 1. Smith's Assumptions

In his initial report, Smith identified in broad terms the legal wrongs that he assumed defendants committed: "I am assuming the defendants infringed the plaintiff's copyrights and trade dress, misappropriated confidential information/trade secrets and breached their contract." (Smith Report at 2). He elaborated somewhat on some of these assumptions later in his report. He specified that "[f]rom October 2004 to September of 2006, RFMAS had meetings with personnel from Mimi So and Richemont. Under the protection of a signed confidentiality agreement, the plaintiffs shared their records, plans, strategies, pricing, which designs are the best sellers, specific methods of dealing with customers and other confidential/trade secret information." (*Id.* at 6

¶ 3 (citing Am. Compl. at 6)).[7] He added, "[a]fter the in-depth discussions with the plaintiff, the defendants[ ] entered the market with a direct infringement of the plaintiff's copyright," and he reiterated, "[f]or the purposes of this report, I am assuming infringement." (*Id.* at 4). He did not specify which of plaintiff's designs he assumed were copyrighted and infringed upon or which Mimi So products were infringements of plaintiff's intellectual property. At points, his initial report discussed the alleged infringement as if it were of one piece[8], but elsewhere it indicated that there were 61 allegedly infringed RFMAS products. (*See id.* at 19 (Table 9)). It also cited to the expert reports of Ms. Jonas and Mr. Lewand, who seemed to believe that there were nine pieces of copyrighted Faraone Mennella jewelry that were infringed by nine pieces of Mimi So jewelry.[9] Smith's report did not mention either the Stella collection or the Gate B9 collection.

His report also seemed to assume that Mimi So was directly responsible for the style of a particular Neiman Marcus ad for Mimi So jewelry, although he did not make

**6.** Although his resume does not list specific years for any of his teaching engagements, it states that at some point, Mr. Smith taught the following 3– or 4–day courses at something called the "American Management Association": "Marketing and Product Management," "Defining and Implementing New Product Programs," and "Managing the Sales Distribution Network." (Smith Report at 21). At Cornell's Graduate School of Management, he taught semester-long courses entitled "Marketing" and "Business Strategy," and "executive programs" entitled "Marketing Strategy" and "Marketing." (*Id.*). At the University of North Carolina, he taught a three-day "Business–to–Business Marketing Strategy" program in the Executive Education Program. (*Id.*).

**7.** *See also id.* at 4 ("with a contract that promised confidentiality, the defendants shared confidential and proprietary trade se-

cret information with both Richemont and Mimi So."). We infer that Mr. Smith intended to say that the plaintiff shared confidential and proprietary trade secrets with defendants, although he did not note this apparent error among the corrections to his report that he offered at his deposition. (*See* Smith Dep. at 53–56).

**8.** Smith Report at 6 (referring to "the infringing necklace"); *id.* at 8 (referring to Mimi So introducing "a copy"); *id.* at 9 (referring to Mimi So's allegedly infringing jewelry as "[t]his product").

**9.** Jonas Report at 7 ¶ 34 ("I have also examined the nine jewelry pieces of Plaintiff's at issue compared to the nine allegedly infringing pieces of Defendants['] at issue [. . . .]"); Lewand Report at 7 ("The evidence of copying is overwhelming when I compare all nine corresponding pieces.").

this assumption explicit in the initial report. (*See* Smith Report at 4–5 & n.11; *id.* at 6 ("Mimi So's 'knock-off' advertisement showing a model wearing the infringing necklace was placed in October 2006.")). He expressed his opinion "[a]s a marketing professional" that the Nieman Marcus ad, for which he assumed Mimi So was responsible, "had the clear potential and intent to confuse the customer" because of its similarity to plaintiff's ad. (*Id.* at 5). At his deposition, he explained that, based on his marketing expertise, he could not imagine that the ad could have been created without Mimi So's input. (Smith Dep. at 145). Apart from asking Steve Hansen for his opinion on the matter, Smith made no effort to find out whether Mimi So had in fact been involved in the production of the ad. (*Id.* at 145–46). Hansen reportedly assured Smith that it was "absolutely [...] not possible" that Mimi So had not been involved at all in the creation of the ad. (*Id.* at 146).

Smith's explanation of Richemont's role in causing plaintiff to lose business with Neiman Marcus consisted of the observations that "[i]n early 2004, Richemont acquired a minority equity share of Mimi So", that Ms. So publicly commented on the partnership and her desire to grow her company internationally, that an executive from Richemont participated in conversations with plaintiff, and that "Hansen believes that Richemont personnel had a significant influence in Neiman Marcus' dramatically reduced purchases." (*Id.* at 7 ¶¶ 7–8). At his deposition, he confirmed

that he had not formed any opinion of his own as to whether Richemont had played a role in causing the decline in plaintiff's sales to Neiman Marcus.[10]

### 2. Evidence Reviewed by Smith

Mr. Smith's findings as to causation and damages rested almost exclusively on the documents that plaintiff provided, although he testified at his deposition that he also ran searches on Google and Lexis Nexis for unspecified key words, and asked plaintiff's counsel and plaintiff's other damages expert, Steve Hansen, to verify his findings.[11] The totality of his deposition testimony suggests that he did not view his assignment as encompassing a requirement that he do any investigation beyond reviewing the materials provided to him.[12]

It appears that plaintiff provided Mr. Smith with some raw data (including some RFMAS invoices and Mimi So sales records) as well as reports summarizing RFMAS's annual sales and the content of various RFMAS invoices as well as defendants' revenues. (*See id.* at 24). Plaintiff also provided Mr. Smith with information from the Wall Street Journal and Federal Reserve on the current and historic prime rate, a February 2004 article in Professional Jeweler entitled "Richemont Partners with Mimi So", the complaint in this action, and the expert reports of Steve Hansen, Joyce Jonas, and Ed Lewand. (*See id.*).

Mr. Smith's initial report did not identify the provenance of the summary documents on which he based his conclusions. At his deposition, he explained that the

---

10. Smith Dep. at 201 ("Q: Do you think that the Richemont defendants had any discussions with Neiman Marcus to get them to push out the plaintiff? A: I don't personally know, but I know that Steve Hansen believes that Richemont had a very heavy hand. But that's not my opinion, because I don't have that background, that in-depth background that he has.").

11. *See id.* at 98–99.

12. *See, e.g., id.* at 36 (stating that, although a company's historical profit margin is relevant to the appropriate projected future, he did not investigate plaintiff's actual profit margin in prior years before calculating its projected profit margin because "that was not my assignment"); Smith Suppl. Report at 1 (stating that the additional research that defendants' counsel suggested he undertake would be "very impractical").

summaries of plaintiff's sales that he reviewed had been prepared by Elana Anderson, an accountant retained by plaintiff's law firm,[13] and that he had "spot-checked" her accounting against some of the original invoices on which she had based her report. (Don. E. Smith Dep., Oct. 2, 2009, Ex. 5 to Richard Lehv, Esq. Decl., Dec. 1, 2009/Ex. 1 to Kenneth Feldman, Esq. Decl., Dec. 18, 2009 ("Smith Dep."), at 22)[14]. He did not review plaintiff's profit-and-loss statements, balance sheets, tax returns, or any other original RFMAS financial reports. (*Id.* at 33). He also relied on a "Gate B9 Revenue Calculation Spreadsheet" purportedly summarizing Mimi So sales information that plaintiff's counsel prepared. (*Id.* at 55–58). He did not independently verify any of the statements in this summary. (*Id.* at 58).

### 3. *Smith's Findings as to Causation*

Mr. Smith concluded in his initial report that defendants' various unlawful acts caused a decrease in RFMAS's sales and profits and the value of RFMAS's brand.[15] He observed that, in 2006 and 2007, plaintiff's total sales fell by 48%, plaintiff's sales of the infringed products fell by 81%, and plaintiff lost Neiman Marcus as a customer—a major blow to plaintiff, considering that, in his opinion, Neiman Marcus was "an extremely important retailer" to plaintiff; sales to Neiman Marcus represented 50% of plaintiff's total annual sales in 2006. (*Id.* at 6). Smith opined that the decline in sales to Neiman Marcus translated directly

into lost profits. (*Id.* at 7). Mr. Smith also posited that the loss of Neiman Marcus as a client caused a diminution in the "perceived value of the [RFMAS] brand in the eyes of other retailers and consumers", explaining that marketing professionals commonly gauge the value of a company's brand based on the company's "commercial successes" and the press that it receives in "quality publications". (*Id.* at 8). However, later in the report he seemed to reverse his theory of causation with respect to the diminution in brand value, asserting that the loss of brand value caused the drop in plaintiff's sales to Neiman Marcus. (*See id.* at 10 ("There is clearly a loss of brand and intellectual property value. It is not possible to precisely quantify this loss. However, it is one of the key reasons for the $3,230,000 loss of profits to Neiman Marcus (Section B).")).

Mr. Smith opined that the loss of Neiman Marcus as a customer and the concomitant declines thereafter in plaintiff's sales, profits, and brand value were due to defendants' unlawful activities.[16] He explained this conclusion primarily by pointing to a temporal proximity between plaintiff's loss of Neiman Marcus as a customer and the release in 2006 of Mimi So's allegedly infringing jewelry. Smith asserted that in 2006, Mimi So began selling its infringing jewelry to Neiman Marcus, citing to a May 2006 invoice to Neiman Marcus. (*Id.* at 5 & n. 12, 6). Smith also

---

13. Defs.' Mem. at 5.

14. The parties have not provided the court with a complete transcript of the depositions of any of the parties' expert witnesses. Pages 13–24, 37–40, 45–48, 53–60, 97–104, 161–168, 193–196, 201–204, and 221–224 of Mr. Smith's deposition are available at Exhibit 5 to the Lehv Declaration. Pages 33–36, 81–84, 93–96, 97–104, 109–116, 145–148, and 197–200 are available at Exhibit 1 to the Feldman Declaration.

15. *See id.* at 7 ("Based on my experience, expertise and the reasons defined in this report, the defendants' actions were the necessary, immediate and direct cause of the plaintiff's lost sales, profits, and reduced intellectual property-brand value.").

16. *See id.* at 7 ("Based on my experience, expertise and the reasons defined in this report, the defendants' actions were the necessary, immediate and direct cause of the plaintiff's lost sales, profits, and reduced intellectual property-brand value.").

pointed to an October 2006 Neiman Marcus advertisement featuring a model wearing Mimi So's allegedly infringing necklace that was, in his opinion, misleadingly similar to one of plaintiff's ads. (*Id.* at 6). He noted that from 2002 to 2006, plaintiff's sales "never decreased, even in the recession." (*Id.* at 3). However, Smith observed, plaintiff's sales to Neiman Marcus began to decline in the fall of 2006, which was right around the time that Neiman Marcus began advertising Mimi So's infringing jewelry and Mimi So's sales to Neiman Marcus began to "rapidly increase". (*Id.* at 6).

His report contains a graphical timeline illustrating events between December 2002 and August 2009 that also appears in Mr. Hansen's report; it is unclear who created it. (*Compare* Hansen Report at 8 (Graph 2) *with* Smith Report at 5 (Graph 2)). On this graph, the creator plotted plaintiff's total sales to Neiman Marcus for the prior 12 months and plaintiff's total sales to Saks for the prior 12 months. (*Id.*). Both lines reflected a general increase in plaintiff's total annual sales to each of these retailers through September 2006, and thereafter, a general decline in plaintiff's total annual sales to Neiman Marcus and a general increase in plaintiff's total annual sales to Saks Fifth Avenue. (*See id.*). The graph also indicates the timing of the events that Smith and Hansen assumed had occurred: defendants' accessing plaintiff's proprietary information and the release of the Neiman Marcus "knockoff" ad for Mimi So jewelry in November 2006. (*Id.*). The graph highlights Mimi So's first sales to Neiman Marcus in May 2006 and a "rapid[ ] increase" in Mimi So's sales from January 2007 through December 2007. (*Id.*).

Smith also relied on the fact that, at the same time, plaintiff's sales to Saks (to which Mimi So did not sell infringing jewelry) continued to increase. (*Id.* at 7; *see*

*also id.* at 5 (Graph 2)). His report stated that "95% of the products sold by Saks were also sold by Neiman Marcus. This supports the basis for my comparison of the sales of Saks and Neiman Marcus." (Smith Report at 19). He reiterated at his deposition and in his supplemental report that he thought that plaintiff's sales to Saks should generally be similar to its sales to Neiman Marcus because "95% of the alleged[ly infringed] products sold by Saks were also sold by Neiman Marcus", which, Smith opined, "clearly shows that Neiman Marcus and Saks sold similar products." (Smith Suppl. Report at 1; *see also* Smith Dep. at 166–67 ("Q: Is it your belief [that Saks and Neiman Marcus] sell a similar mix of products? A: Yes! Go back to Table 9. The overlap is 95 percent on infringed product. 95 percent overlap. [ . . . ] That's pretty similar.")).

However, the table that Smith offered to support this assertion does not demonstrate what Smith claims it does. In this table, listed in one column labeled "item" are 61 different combinations of letters and numbers that we infer refer to individual pieces of protected RFMAS jewelry that plaintiff alleges were infringed by defendants. (*See* Smith Report at 19 (Table 9)). In the next two columns, labeled "Neiman Marcus" and "Saks", Smith lists dollar amounts that we infer are Neiman Marcus' and Saks' revenues from sales of each particular piece of RFMAS jewelry through August 2009. (*See id.* & n. 51). The table seems to reflect that revenues from sales of all allegedly infringed RFMAS jewelry at Neiman Marcus total $1,733,046, while revenues from sales of all allegedly infringed RFMAS jewelry at Saks total $884,014. (*See id.*). Below these revenue totals are two lines, which read "$ also sold by NM: $836,044" and "% also sold by NM: 95%". (*Id.*). It appears that "$ also sold by NM" refers to the total revenues from sales at Saks of the specific pieces of allegedly infringed

Stella jewelry that were also on offer at Neiman Marcus, and that he derived the 95% figure by dividing $836,044 by $884,014—revenues from sales at Saks of all allegedly infringed Stella goods divided by revenues from sales at Saks of the allegedly infringed Stella goods that were also sold at Neiman Marcus. Thus, the 95% figure is not actually, as Smith claims, the percentage of allegedly infringed Stella products sold by Saks that were also sold by Neiman Marcus;[17] rather, the table demonstrates that 95% of Saks' revenues from sales of allegedly infringed Stella pieces were from the sale of pieces that were also sold at Neiman Marcus.

In his initial report, Mr. Smith added in passing, "I have considered alternative theories of causation including the economy, the potential shift of consumer preferences and Neiman Marcus dropping the plaintiffs for other reasons. However, I did not find any documents or evidence that could explain why Neiman Marcus's sales of RFMAS fell so rapidly." (Id. at 7).

He explained the reasons for his conclusions that defendants' unlawful activities damaged the value of plaintiff's brand as follows:

The defendants' actions were the necessary, immediate and direct cause of significant damage to RFMAS' brand. The basis for this conclusion:

1. Loss of Neiman Marcus as a significant retailer. This is especially damaging because Neiman Marcus is one of the most prestigious retailers of luxury goods in the United States. Losing the business of a premier luxury goods retailer like Neiman Marcus is a major setback in development and growth of a branded luxury goods business. The loss of Neiman Marcus as a customer diminishes the perceived value of the brand in the eyes of other retailers and consumers.[18]

2. Mimi So introducing a copy that had questionable design integrity and confusing similarity into the luxury goods retail market.[19]

3. The appearance in the market of copies that usurped the uniqueness of the plaintiffs' products. This product confused consumers and retail buyers concerning the value, integrity and authenticity of the plaintiffs' jewelry.[20]

4. Market confusion. Editors and customers were commonly confused and forced Amedeo Scognamiglio and Faraone Mennella to try to explain the unexplainable. This confusion directly reduced sales.[21]

17. Table 9 reflects that Saks sold 46 of the 61 allegedly infringed RFMAS items listed, and Neiman Marcus sold 53. A total of 38 of the 61 items were sold at both stores. Thus, 38 out of 46 (82.6%) of the allegedly infringed items sold by Saks were also sold by Neiman Marcus; 38 out of 53 (71.7%) of the allegedly infringed items sold by Neiman Marcus were also sold by Saks.

18. In a footnote, Mr. Smith provided the following citation: "Telephone conversation with Steve Hansen, plaintiff's jewelry financial and marketing expert. This is consistent with my expertise and the information in this case." (Id. at 8 n. 26).

19. In a footnote, Mr. Smith provided the following citation: "Telephone conversation with Steve Hansen, plaintiff's jewelry financial and marketing expert. J[.] Jonas, plaintiff's jewelry design expert, 'Confusion of Customer' discussion, appendix 1–9." (Id. at 8 n. 27).

20. In a footnote, Mr. Smith provided the following citation: "Telephone conversation with the plaintiffs. J[.] Jonas report, plaintiff's jewelry design expert, 'Confusion of Customer' discussion, appendix 1–9." (Id. at 9 n. 28).

21. In a footnote, Mr. Smith provided the following citation: "Telephone conversation

5. My review of the expert reports written by Steve Hansen, Joyce Jonas, and Ed Leward [sic] and telephone conversations with Steve Hansen. [ [22] ]

(Smith Report at 8–9 & nn. 26–30).

#### 4. *Smith's Findings as to Damages*

Mr. Smith determined that plaintiff lost $5,223,000 in profits from loss of sales of all RFMAS products to Neiman Marcus that is attributable to defendants' assumed misconduct. Of that total, $3,230,000 represented the lost profits from lost sales to Neiman Marcus of the infringed products alone. (*Id.* at 10). He also opined that defendants generated $1,402,000 in sales of infringing products, $1,156,000 of which was from sales to retailers other than Neiman Marcus. (*Id.* at 10, 15, 16). Finally, he determined that it was not possible to quantify the damage that defendants caused to the value of plaintiff's "brand and intellectual property". (*Id.*).

#### (a) *Plaintiff's Lost Sales*

Mr. Smith based his calculation of plaintiff's lost profits on five points of data: plaintiff's actual sales to Neiman Marcus of all RFMAS products in 2002, 2003, 2004, 2005, and 2006.[23] After plotting these five data points on a graph, he used a pre-set function in Microsoft Excel to generate a "best-fit line". (*Id.* at 12). He explained this approach later in his report:

> The use of trend lines to forecast sales is very common practice for marketing professionals. It is very common practice to use trend lines on historic sales to forecast future sales. For example, these graphs were created on a standard feature of Microsoft Excel. The soft-

ware calculates the best fit line using different types of curves, calculates the correlation coefficient, defines the equation and will plot the forecast.

(*Id.* at 17 & n. 46). At his deposition, Mr. Smith defended his choice of growth curve as being "very common", and a "classic" means of projecting future sales of new products, citing the "extraordinarily high" success rate for "mom and pop restaurant[s]". (Smith Dep. at 221–22). However, he acknowledged that he had no idea what the success rate was for new products in the jewelry industry, specifically, and that he had not researched this fact. (*Id.* at 222–224). He also conceded that he undoubtedly would have relied on such data if it had been provided to him. (*Id.* at 224).

Mr. Smith then extended this linear trend line out through 2013 to determine what plaintiff's total sales of all RFMAS products to Neiman Marcus would have been for 2006 through 2013 "but for" defendants' unlawful activity. (*See id.* at 12–13). Mr. Smith asserted that it was conservative to project lost sales for only five years, and explained that he took this conservative approach because the principals of RFMAS had indicated to him in telephone conversations that "there is no basis to expect Neiman Marcus to begin selling significant quantities of RFMAS products." (*Id.* at 13; *see also id.* at 13 n. 36). For the years 2006 through 2009, Mr. Smith subtracted plaintiff's actual sales to Neiman Marcus from the projected "but-for" sales to Neiman Marcus to determine plaintiff's lost sales. (*Id.* at 13). For the

with Amedeo Scognamiglio and Faraone Mennella, owners of RFMAS." (*Id.* at 9 n. 29).

**22.** In a footnote, Mr. Smith provided the following citation: "Hansen expert report, appendix 1–8. Jonas and Leward [sic] expert reports, appendix 1–9." (*Id.* at 9 n. 30).

**23.** Although Mr. Smith labeled the graph depicting these five points of data "Neiman Marcus's sales (all products)" (*id.* at 12 (Graph 6)), the preceding graphs in his report make it clear that these data points represent RFMAS's total sales *to* Neiman Marcus. (*See id.* at 11 (Graph 5)).

years 2010 through 2013, the projected "but-for" sales represented plaintiff's lost sales, since there were no actual sales to Neiman Marcus in those years to subtract. (*See id.* (Table 3)).

### (b) *Plaintiff's Lost Profits*

To calculate lost profits for 2006 through 2013, Mr. Smith multiplied lost sales for those years by 0.36. (*Id.* at 13). He asserted that a 36% "incremental profit rate" was "conservative" (*id.*), citing a telephone conversation with Steve Hansen, plaintiff's other damages expert. (*Id.* at 13 & n. 37).[24] Smith did not base this profit rate on an examination of RFMAS's historical profit margin, although he conceded at his deposition that that factor would be relevant to a determination of the company's future profit margin. (*See* Smith Dep. at 33, 37).

He then determined the present value of those lost profits by applying a "present value multiplier" based on a 5% annual decrease in the value of money. (*Id.* at 13).[25] Mr. Smith asserted that this rate was "conservative." (*Id.*). In support of this assertion, he noted that the prime rate on August 26, 2009 was 3.25%, and observed that "[a] common guideline is to use 1% over prime. Thus a 5% discount for future profits is conservative. The prime rate in 2007 was 8.1% and 5.1%. Thus, a 5% discount for historic profits is also conservative." (*Id.* at 13 n. 38). Finally, he added together the present value of the lost profits for 2006 through 2013 to arrive at a total of $5,223,000 in lost profits (present value) from sales of all RFMAS products to Neiman Marcus. (*Id.* at 13).

Although Smith opined that the present value of lost profits from sales to Neiman Marcus of all RFMAS products was an appropriate measure of damages in this case, he separately calculated the present value of plaintiff's lost profits from sales to Neiman Marcus of only the infringed goods. (*Id.* at 17). He began again with five points of data, but this time, he used plaintiff's actual sales of infringed products only (rather than all RFMAS products) to Neiman Marcus in 2002, 2003, 2004, 2005, and 2006. He then applied the same methodology and rates, arriving at a present value of $3,230,000 in lost profits from lost sales to Neiman Marcus of infringed products. (*Id.* at 17–18).

### (c) *Defendants' Profits*

Smith also calculated defendants' sales from infringing goods, on the theory that plaintiff would be entitled to defendants' profits from infringing goods and that it is incumbent upon defendants to demonstrate the related sales expenses that should be deducted from revenues to determine profits. (*Id.* at 15 & nn. 40, 42 (citing conversations with K. Feldman, plaintiff's attorney)). He added together figures from a document entitled "Gate B9 revenue calculation spreadsheet", which plaintiff's counsel provided to him, and concluded that, based on those figures, defendants' total sales of infringing products through September 4, 2009 were $1,402,297, of which $1,156,000 were sales to retailers other than Neiman Marcus. (*Id.* at 15–16 & nn. 41, 43, 44).

---

**24.** At his deposition, defendants asked Mr. Smith if there was any basis for his choice of profit margin and his assertion that it was "conservative", other than his conversation with Mr. Hansen, and Mr. Smith responded that this was also based on his experience in marketing and sales for 45 years. (*Id.* at 34–35).

**25.** Because he was performing the calculation in 2009, the lost profits for that year were equal to the present value of lost profits. For 2008, Smith multiplied the lost profits by 1.05; for 2007, by 1.10, and so forth. For 2010, he multiplied the lost profits by .95, and so on. (*See id.* at 13 (Table 3)).

## B. *Steven Hansen*

Steven L. Hansen is a licensed CPA. (Hansen Report at 2). Since 1987, he has served as the CFO of many jewelry companies. (*Id.*). He asserted in his report that he has "[e]xperience in evaluating and quantifying the impact of incremental and/or lost financial and business opportunities with financial forecasting and modeling techniques." (*Id.*).

### 1. *Hansen's Assumptions*

Hansen's initial report states that he "was asked to assume infringement, misappropriation of trade secrets and breach of contract occurred". (Hansen Report at 4). He later specified that these actions "includ[ed], but [were] not limited to, the introduction of a competing knocked off product, and the use of confidential business and trade secrets to undermine the Plaintiff's supplier relationship with Neiman Marcus". (*Id.* at 9).

The scattered references in Hansen's report to defendants' misuse of plaintiff's confidential information and trade secrets provide additional insight into the nature of his assumptions. He stated that, from October 2004 through September 2006, plaintiff shared "detailed confidential information with defendants". (*Id.* at 8 (Graph 2)). He described this information as "proprietary information about [plaintiff's] products and customers" that was "sufficient to enable the defendants to knock off RFMAS' best selling jewelry products and go after its best customer", and he stated that defendants "[had] access to and us[ed] the confidential and proprietary information of what particular pieces in the line are popular, what characteristics of the design are important to copy, and all of the

other customer program specific information". (*Id.* at 8). He later summarized:

> In good faith, and under the auspices of a confidentiality and implied non-competition agreement plaintiffs entered into merger discussions and gave Richemont all information it requested about its products, sales practices, customer relationships, and marketing programs. By misappropriating these trade secrets, copying the products and pursuing expansion of its luxury goods vendor relationship with Neiman Marcus, all in violation of the confidentiality agreement, Richemont clearly further leveraged itself and Mimi So into the Neiman Marcus relationship and damaged RFMAS['] business.

(*Id.* at 9).

At Hansen's deposition, when asked what confidential information defendants had misappropriated in order to copy plaintiff's products, he first replied that "[o]nce they understood how the—how the products were constructed, they could construct [ . . . ] identical products to compete". (Steven L. Hansen Dep., Oct. 2, 2009, Ex. 6 to Richard Lehv, Esq. Decl., Dec. 1, 2009/Ex. 2 to Kenneth Feldman, Esq. Decl., Dec. 18, 2009 ["Hansen Dep."] at 61).[26] When confronted with the fact that plaintiff's Stella jewelry and defendants' Gate B9 jewelry are not constructed in the same manner,[27] Hansen conceded this and changed his answer, asserting that defendants used plaintiff's trade secrets to learn the "general design criteria and methods of forming the ideas of how the jewelry was created and the looks and aesthetic appearance that was of the jewelry, more precisely than you could just by—by look-

---

**26.** Pages 49–52, 65–68, 89–104, 109–112, and 153–156 of Mr. Hansen's deposition are available at Exhibit 6 to the Lehv Declaration. Pages 13–16, 25–36, 61–64, 105–108, 129–132, and 141–144 are available at Exhibit 2 to the Feldman Declaration.

**27.** The links in plaintiff's allegedly infringed necklace are made out of hollow tubing, while each link in defendants' necklace is cast. (Hansen Dep. at 61–62).

ing at it in stores and magazines." (*Id.* at 62). When pressed for specifics as to the pieces of information that defendants allegedly misappropriated, he responded, "information concerning the trade secrets and operating practices of the company". (Id. at 63). When asked to explain how this confidential information would allow defendants to make a better copy of plaintiff's jewelry than they could simply by examining the jewelry, he changed his answer to "information concerning their design practice and—and theory". (*Id.* at 63–64). He conceded that he was unable to explain what such information could possibly consist of, because he was not an expert in design practice and theory. (*Id.* at 64).

He also explained at his deposition that he assumed that the breach of contract had arisen out of "[t]he Richemont RFMAS nondisclosure agreement, confidentiality agreement." (*Id.*). He had assumed that all defendants had breached the contract, although he admitted that he was unsure whether Ms. So or Mimi So, International were parties to the contract that he was assuming had been breached. (*Id.* at 65). He conceded that he had made no assumptions about whom defendants had allegedly disclosed the confidential information to, and that he had not asked plaintiff about this. (*Id.* at 65–66).

### 2. *Evidence Reviewed by Hansen*

Mr. Hansen reached his conclusions after reviewing documents provided to him by plaintiff; he did no independent investigation. (Hansen Dep. at 108–09). The documents he reviewed included those provided to both him and Mr. Smith as well as substantial testimony from witnesses in this case [28] and communications between RFMAS and Richemont, including those parties' non-disclosure agreement. (*See* Hansen Report at 23). Like Mr. Smith, Mr. Hansen only examined "some of the actual invoices" that plaintiff's accountant had summarized. (Hansen Dep. at 142).

### 3. *Hansen's Findings as to Causation*

Mr. Hansen's initial report concluded that "[t]he defendants destroyed the relationship and future business opportunities with the Neiman Marcus retail chain and greatly diminished the enterprise value of RFMAS," and thus, that "the Defendants['] actions are a necessary, immediate, and direct, cause of RFMAS' damages", including lost profits and a diminution in the value of RFMAS's copyrights. (Hansen Report at 6). He purported to base this conclusion on (1) his knowledge of what makes a jewelry business successful,[29] (2) his perception that the parties' jewelry was marketed in similar ways,[30] (3) anecdotal evidence that some customers were confused by the similarity between the parties' jewelry and marketing,[31] and (4) an examination of the timing of various events in the development of the parties' relationship with each other and of trends in their respective sales to Neiman Marcus and Saks.[32]

With respect to the first consideration, he explained that "wholesale buyers at re-

---

**28.** Hansen reviewed three declarations and nine deposition transcripts, including testimony by the two principals of RFMAS, several principals of the Richemont and Mimi So defendants, and a buyer for Neiman Marcus. (*See* Hansen Report at 23).

**29.** See id. at 7 (section entitled "Characteristics of the Jewelry Business").

**30.** See id. at 13–14 (section entitled "Marketing Similarity").

**31.** See id. at 14 (paragraph entitled "Confusion").

**32.** See id. at 8–13 (sections entitled "Trajectory of the Parties' Relationships" and "Trajectory of parties' sales to Neiman Marcus and Saks Fifth Avenue").

tail stores and ultimately consumers seek the latest and most appealing creative design[. . . .] When copying occurs it creates confusion in the marketplace and destroys the unique appeal of the jewelry." (*Id.* at 7). Thus, he reasoned, defendants' infringement diminished plaintiff's brand recognition and reduced its revenues and therefore profits.

As for the second and third considerations, Mr. Hansen examined a Neiman Marcus ad for plaintiff's jewelry and a Neiman Marcus ad produced a year later promoting Mimi So's jewelry, and opined in his initial report that they were "essentially the same ad, with the same jewelry, posed the same way." (*Id.* at 14). However, at his deposition, he was shown higher-quality reproductions of the ad, which allowed him to see details he had missed before. (Hansen Dep. at 154). He conceded that, upon closer inspection, the ads actually appeared dissimilar. (*Id.* at 155). He asserted that his initial opinion that the ads were similar was consistent with the "testimony that people have been confused by the Defendants' jewelry and its marketing into believing it is associated with RFMAS". (Hansen Report at 14).[33] Invoking his understanding of how jewelry advertisements are produced, he posited that defendants would likely have played a role in the creation and approval of the Neiman Marcus ad. (*Id.*). Thus, he concluded, defendants' infringement of plaintiff's jewelry design and the similarity of the parties' advertisements were likely both intentional.[34]

Finally, Hansen set forth the same graphical time line of purportedly significant events between December 2002 and August 2009 that appears in Mr. Smith's report. (*Compare* Hansen Report at 8 (Graph 2) *with* Smith Report at 5 (Graph 2)). He observed that after plaintiff shared information with defendants and after Neiman Marcus began to advertise Mimi So's allegedly infringing jewelry, plaintiff's sales to Neiman Marcus tapered off, even though plaintiff's sales to Saks continued to rise. (*Id.* at 10). He noted that Saks was similar to Neiman Marcus but that Mimi So had not sold the allegedly infringing jewelry to Saks,[35] and concluded that defendants' actions must have caused the tapering off of plaintiff's sales to Neiman Marcus:

> Given my experience in the business, the subsequent destruction of the Neiman's opportunity was not a coincidence, but the result of Defendants['] actions, including, but not limited to, the introduction of a competing knocked[-]off product, and the use of confidential business and trade secrets to undermine the Plaintiff's supplier relationship with Neiman Marcus[.] The timing of the introduction of the infringing product with the peak fall selling season suggests that the defendants used confidential information obtained in merger discussions to steal RFMAS business at the most lucrative time of the year.

**33.** He did not identify who had so testified or cite any source for this information.

**34.** *Id.* at 13 ("When luxury brand copying is coupled with duplicative advertising it takes on the more sinister tone of overtly conspiring to cause brand and authorship confusion in the marketplace with the commercial intention of diverting revenue and profits from the owner/creator."); *id.* at 13–14 ("I conclude that Defendants not only copied the jewelry designs but appropriated the advertising to

further confuse the issue of the jewelry's origins"); *id.* at 14 ("This similar marketing is another indicator that Defendants['] actions were designed to be [ . . . ] a necessary, immediate and direct cause of the damage to RFMAS").

**35.** *Id.* at 10 ("Saks Fifth Avenue competes directly with Neiman Marcus stores in retail luxury goods. Many of the top luxury brands are carried at both retailers.").

(*Id.* at 9).[36] At his deposition, he explained that he believed that plaintiff's sales at Saks continued to rise because of increasing customer demand for the pieces, but he conceded that he had not investigated why plaintiff's sales to Saks rose. (Hansen Dep. at 131). He also explained in his supplemental report that he thought plaintiff's sales to Saks were a good predictor of plaintiff's sales to Neiman Marcus absent defendants' misfeasance because Saks and Neiman Marcus are "competitors", citing statements on the two companies' Wikipedia entries and in their 10–K filings with the SEC. (Hansen Suppl. Report at 2).

Mr. Hansen also mentioned a few alternative explanations for the decline in plaintiff's sales to Neiman Marcus, and rejected them all, with varying degrees of consideration and explanation. First, he stated that, based on his knowledge of revenue trends in the jewelry industry, the drop-off in sales to Neiman Marcus could not be attributed to normal revenue fluctuations.[37] Second, he observed that plaintiff's deposition of a buyer for Neiman Marcus "did not indicate the presence of any issues of product quality, delivery issues, changes in buying office personnel or direction, or insufficient sell[-]through of RFMAS products as a cause for the abrupt and precipitous decline in purchases from the company" (*id.* at 11), and dismissed those theories as possible causes of the drop-off in sales because of a "lack of evidence". (*Id.* at 12).

He also observed in his report that, "[i]n the jewelry trade, the immense relationship leverage enjoyed by a luxury brand vendor like Richemont with a retailer like Neiman Marcus is difficult if not impossible to compete with." (*Id.* at 9). However, he did not explain why this competitive advantage over RFMAS could not have caused the decline in plaintiff's sales to Neiman Marcus. Instead, he concluded that "it is clear that without violating the confidentiality provisions of its discussion [sic] and using knowledge and trade secrets obtained directly from RFMAS, and without copying the jewelry products of RFMAS, defendants would not have been able to compete successfully for this share of Neiman Marcus business." (Id. at 9).

In his supplemental report, he added that the decline in plaintiff's sales at Neiman Marcus and the contemporaneous increase in sales at Saks could not have been the result of customers shifting from Neiman Marcus to Saks because such a phenomenon would be "fantastic" and, based on his experience in the industry, unprecedented. (Hansen Suppl. Report at 3).

4. *Hansen's Findings as to Damages*

Mr. Hansen endorsed Mr. Smith's methodology for calculating RFMAS's lost profits as "reasonable". (*Id.* at 16, 17). He based this conclusion on his review of Smith's report and the sales information that Smith relied on, as well as additional information about RFMAS's customers and financials compiled by RFMAS and RFMAS's federal income-tax returns. (*Id.* at 16–17). Hansen explained that, based on his "experience and knowledge of a developing jewelry company," a 36% incremental profit rate was "reasonable and conservative". (*Id.* at 17).

---

**36.** *See also id.* at 10 ("It is hard to ascribe the sudden fall in [plaintiff's] sales [to Neiman Marcus] to anything but Defendants' actions.").

**37.** *Id.* at 10–11 ("The revenue from Neiman Marcus tripled from 2004 to 2005 and increased by almost 40% during 2006 showing solid success and expansion. During 2007 the Company lost almost half of its sales and sales are continuing to fall to a virtually nonexistent level in 2009. This disruption in the revenue trend is unusual in the market place. Rarely does a supplier fall so far so fast with a retailer who in essence sponsored the company's rise to fame.").

With respect to Smith's finding that RFMAS's lost sales to Neiman Marcus amounted to approximately $5.2 million in present-day dollars, Hansen observed that this conclusion was "reasonable" but also "conservative". (*Id.* at 16, 17). He opined that Smith had "substantially understate[d] the loss suffered by RFMAS, in several respects". (*Id.* at 17). Hansen noted several examples, including the following:

- [Smith's] revenue assumptions hold that the established business with Neiman Marcus would have grown to be lower than sales to Saks Fifth Avenue during the forecast period. I believe it is reasonable to conclude that the growth of business with Neiman Marcus would have been substantially higher. Neiman Marcus was the original sponsor/discoverer of the Faraone Mennella jewelry line, and helped it gain traction as a luxury brand at retail. As such, RFMAS would have enjoyed a longer history and substantial support from this extremely important relationship.

- The projected revenue stream only extends four years into the future. It is my opinion and experience that these relationships typically last for many years and a seven[-]year forward[-]looking projection would not be an unreasonable approach to valuing the continuing revenue stream.

(*Id.* at 17; *see also id.* at 18). Hansen added that, in addition to causing plaintiff to lose future sales to Neiman Marcus, the defendants' infringing activities had diminished the value of plaintiff's brand and copyrights and the overall value of the company. (*Id.* at 18). He estimated the impairment to RFMAS's "enterprise value" at $26 million. (*Id.*). The explanation in his initial report of this calculation consisted of the following statement:

The impact [of defendants' actions] on the enterprise value of RFMAS is known to be a multiple of the lost profits. I believe that the true value of RFMAS in a potential sale transaction suffered an enormous impairment, which I have conservatively estimated at $26 million based upon the current purchase multiples paid in similar transactions.

(*Id.*). He explained at his deposition that this calculation was premised on the theory that a company's value is approximately six times its discounted cash flows. (Hansen Dep. at 155–56; Hansen Suppl. Report at 2). However, he explained in his supplemental report that after estimating plaintiff's projected earnings absent defendants' illegal conduct (which he estimated to be $5.2 million), he multiplied that figure by five, rather than six, to arrive at an enterprise value of approximately $26 million. (*Id.*). He attached to his supplemental report a detailed spreadsheet titled "Projected Profit and Loss Statement with Loss Revenues", which he said he had prepared and relied on in his initial report but had forgotten to attach. (Hansen Suppl. Report at 1, 5).

## C. *Analysis*

We note at the outset that even if the testimony of plaintiff's putative damages experts were admissible, it would be of limited utility. Mr. Smith and Mr. Hansen were not asked to (and did not) distinguish between the liability of the Mimi So defendants and the Richemont defendants or separate the harms flowing from each assumed legal violation (copyright infringement, trade dress infringement, misappropriation of trade secrets, and breach of contract). They concluded only that "defendants' actions", collectively, caused the deterioration of plaintiff's relationship with Neiman Marcus.[38] Thus, their testimony,

---

**38.** *See* Smith Report at 8 ("[t]he defendants' actions were the necessary, immediate and

if admissible, would be helpful to determining damages only if all defendants were found jointly and severally liable on every cause of action alleged. (Accord Steven Schwartz Report, Oct. 15, 2009, Ex. 15 to Richard Lehv, Esq. Decl., Dec. 1, 2009 ["Schwartz Report"], at ¶ 4(a)).

At any rate, we conclude that the reports of Mr. Smith and Mr. Hansen should be stricken and that they should be precluded from testifying as experts on damages. As we explain below, they are not qualified to opine as experts on the subject matter of much of their testimony, and the remainder of their testimony relies on insufficient data and is the result of unreliable methodologies.

### 1. Causation

### (a) Smith and Hansen Are Not Qualified to Offer Their Testimony on Causation.

■ Mr. Smith's and Mr. Hansen's testimony on causation ultimately boils down to opinions as to why Neiman Marcus reduced its purchases of plaintiff's jewelry. Determining what motivated a particular person or entity is generally not an appropriate subject matter for expert testimony. See, e.g., Brazier v. Hasbro, Inc., 2004 WL 515536, *7 (S.D.N.Y. Mar. 16, 2004) (toy design engineer's expert testimony on child's motivations for putting a toy into the child's mouth inadmissible because toy engineer not qualified to opine on this subject matter and even if he were, his testimony would lack a factual basis); Bazile v. City of New York, 215 F.Supp.2d 354, 365 (S.D.N.Y.2002) (excluding law enforcement expert's testimony that NYPD was motivated by discriminatory animus because expert was not qualified to opine on NYPD's motivation and because his opinion was speculative and did not fit the facts of the case).[39]

■ Moreover, even if the causation of plaintiff's damages in this case were an appropriate subject for expert testimony, Smith and Hansen are not qualified for the task. (Accord, Defs.' Reply Mem. at 3–4). Neither expert's skill, experience, training, or education gives him specialized knowledge about why Neiman Marcus decided to reduce its sales from RFMAS. Smith has no expertise in luxury jewelry purchasing, much less experience with Neiman Marcus' decision-making process in particular. (See, e.g., Smith Report at 2, 21–23; Smith Dep. at 101 ("[My] skill set

direct cause of significant damage to RFMAS' brand."); id. at 17 ("The defendants' actions were the necessary, immediate and direct cause of RFMAS losing the entire Neiman Marcus account.") (emphasis in original); id. (describing plaintiff's lost sales to Neiman Marcus as "Neiman Marcus' 'but for the defendants' actions' sales of RFMAS products"); Hansen Report at 3 ("There is a necessary, immediate, and direct, causal connection between the Defendants' actions and RFMAS' damages."); id. at 6 ("the Defendants['] actions are a necessary, immediate, and direct, cause of RFMAS' damages. (Including lost profits and the diminution of the value of its copyrights)[.] The defendants destroyed the relationship and future business opportunities with the Neiman Marcus retail chain and greatly diminished the enterprise value of RFMAS."); id. at 10 ("The trajectory of the parties' sales shows clearly that Defendants' actions damaged RFMAS. It is hard to ascribe the sudden fall in sales to anything but Defendants' actions.").

39. In Bazile, the court observed that the expert witness' proffered testimony that the NYPD had acted with discriminatory animus "does not rely upon any theory related to discriminatory motivations, nor are there any standards which control the operation of his opinions. The Court finds that his conclusions will be of little value to the finder of fact. The average jury can assess whether or not the NYPD acted with a discriminatory animus without the assistance of [this witness'] testimony." Bazile, 215 F.Supp.2d at 365 (citing Daubert, 509 U.S. at 591–92, 113 S.Ct. 2786; Fed.R.Evid. 702).

in this case was complementary to Steve Hansen, and Steve Hansen is the jewelry expert[.]")). And Hansen's wealth of experience in the jewelry industry does not include experience as a buyer for Neiman Marcus or even experience selling jewelry products to Neiman Marcus. (Hansen Dep. at 35; see also Hansen Report at 2, 20–22). The only basis proffered by either expert to suggest that he is remotely qualified to opine on what caused Neiman Marcus to dissolve its relationship with plaintiff is Mr. Smith's self-serving assertion at his deposition that his background gave him an understanding of "the gaining and losing of key accounts". (Smith Dep. at 104; Pl.'s Mem. at 12 (citing id.)). This conclusory statement is plainly inadequate to satisfy plaintiff's burden of proving by a preponderance of the evidence that its experts are qualified to offer their proposed testimony. Smith and Hansen simply do not draw on their areas of actual expertise in arriving at the conclusion that defendants' alleged infringement and other legal wrongdoing caused plaintiff's diminished sales to Neiman Marcus and the other harms that allegedly flowed from therefrom. Rather, both appeared to have made logical deductions based on the set of assumptions that plaintiff directed them to employ and the circumscribed universe of data available to them. Any juror could have employed common sense to perform the same analysis; no background in marketing or experience in the jewelry industry is necessary.

Indeed, Mr. Smith's testimony is so riddled with logical errors that a jury might be better equipped to understand the evidence without exposure to his testimony. His findings as to causation are tautological in that he identified the loss of Neiman Marcus's business as both a cause and a result of the diminution in plaintiff's brand value.

(b) *Smith's and Hansen's Conclusion That Defendants Caused Plaintiff's Damages Is the Product of an Unreliable Methodology.*

(i) *Smith and Hansen Do Not Provide Enough Information About Their Assumptions.*

Defendants urge that the testimony of plaintiff's putative experts is inherently unreliable because plaintiff's counsel provided almost all of the data on which they based their opinions. Defendants have not identified what, if any, information provided to the experts was inaccurate or what relevant information was withheld from the two experts. Unless the information or assumptions that plaintiff's experts relied on were "so unrealistic and contradictory as to suggest bad faith," inaccuracies in the underlying assumptions or facts do not generally render an expert's testimony inadmissible. *Zerega Ave. Realty Corp.*, 571 F.3d at 214 (quoting *Boucher*, 73 F.3d at 21). If plaintiff provided its experts with a piece of false information or withheld relevant data, defendants can cross-examine the experts on this matter, calling into question the weight that the jury should accord their testimony. For this system to work, however, plaintiff's experts must lay bare the information and assumptions on which they relied. Here, Smith and Hansen have not explained their assumptions with the level of specificity necessary to allow defendants' counsel and the jury to test their conclusions. For this reason as well, their testimony on causation should be excluded.

Plaintiff asked Smith and Hansen to assume that defendants were liable on all causes of action against them, and to determine whether the acts underlying defendants' alleged legal violations caused plaintiff's decline in sales to Neiman Marcus. However, neither expert has identi-

fied with any amount of precision what the hypothetical acts on the part of defendants are that, according to Smith and Hansen, caused the decline in sales.

Smith and Hansen clearly knew that the alleged conduct by defendants included copying some aspect of plaintiff's Stella line, but they did not offer a clear articulation of which pieces in the Stella line they assumed were protected by plaintiff's copyright and which designs of individual pieces or elements of trade dress were allegedly infringed. In fact, as we noted above in discussing their assumptions, they offer multiple versions of this assumed fact.

Smith's and Hansen's understanding of what the other alleged legal violations consisted of is even thinner. For example, Hansen and Smith concluded that defendants' alleged misappropriation of trade secrets was one cause of the decline in plaintiff's sales to Neiman Marcus. However, they failed to specify in their reports what trade secrets were stolen, or how defendants allegedly used those stolen trade secrets. (Michele M. Riley Report, Oct. 15, 2009, Ex. 10 to Richard Lehv, Esq. Decl., Dec. 1, 2009 ["Riley Report"] at 20–21 ¶¶ 50–52, 55). Although Smith and Hansen identified information that is generally treated as confidential to which they assumed defendants had access, neither of them offered any insight into how they were assuming defendants had used such information in order to damage plaintiff. Without explaining how defendants' assumed misappropriation of trade secrets and breach of contract contributed to plaintiff's damages, a jury cannot test their conclusions that these acts were a but-for cause of plaintiff's damages.

Moreover, their depositions and supplemental reports suggest that Smith and Hansen did not merely fail to spell out in their reports the factual basis for their conclusions; rather, it appears that they proceeded through their investigations into causation without articulating even for themselves what, precisely, defendants' assumed conduct consisted of. An expert's testimony that plaintiff's damages were caused by a series of acts by defendants is necessarily an exercise in speculation when the acts that purportedly caused the damages are only hypothesized to have occurred. When the expert cannot even identify what defendants' damaging conduct consisted of, his testimony on causation is not merely suppositional—it is inherently unreliable.

(ii) *Neither Expert Sufficiently Considers Alternative Causes.*

Even if Smith's and Hansen's testimony rested on a sufficient (and sufficiently transparent) factual basis, it would nonetheless be inadmissible because their analysis of what caused the decline in plaintiff's sales to Neiman Marcus is simply inadequate to support the conclusion that defendants' misfeasance was the cause. Both experts relied heavily on two considerations: first, that plaintiff's sales to Saks continued to increase while plaintiff's sales to Neiman Marcus decreased, and second, that there was no evidence of other possible causes for the decline in plaintiff's sales to Neiman Marcus. Neither of these proffered justifications holds up to scrutiny.

Smith committed several logical errors in reasoning that, absent defendants' interference, plaintiff could have expected to sell to Neiman Marcus roughly the same volume of sales of allegedly infringed items as it sold to Saks. His claim that "95% of the [allegedly infringed Stella] products sold by Saks were also sold by Neiman Marcus" is neither true (see supra, at 259-60) nor, in any event, helpful. It is unclear why Smith believed that he could determine whether plaintiff's Stella line was similarly situated at Saks and Neiman Marcus by analyzing only Saks' revenues. The fact that Saks made most of its reve-

nues from Stella products through sales of products that were also available at Neiman Marcus says nothing about how many of the products from the Stella line available at Neiman Marcus were also offered by Saks, which is the more relevant consideration for Smith's purpose. The ratio also says nothing about whether the stores sold comparable mixes of fine jewelry as a whole or whether plaintiff offered its products to both retailers on equally attractive terms. Applying Smith's reasoning, if Saks sold only one piece of plaintiff's allegedly infringed Stella jewelry, and Neiman Marcus also sold one of that piece for the same price, then Smith would deem those stores' mix of products to be "100% similar" and their sales prospects analogous, even if this was the sole piece of jewelry available for purchase at both stores, even if Neiman Marcus also sold thousands of other pieces of plaintiff's jewelry, and even if Neiman Marcus made a substantially greater profit on each piece than Saks did. Indeed, defendants' counsel pointed out to Smith at his deposition that Neiman Marcus "sells more than twice as much infringed products in its mix of products as Saks". (Smith Dep. at 106). Counsel then asked whether Smith nonetheless believed that they sell "a similar mix of products", to which Smith replied, "Yes! Go back to Table 9. The overlap is 95 percent on

infringed product. 95 percent overlap. [. . .] That's pretty similar." (*Id.* at 166–67). In sum, whether or not it is ultimately appropriate to treat Saks as a "control",[40] Smith's proffered justification for this choice does not amount to a reasoned explanation of his methodology. The fact that he relies on a statistic that does not reflect what he claims it does and that he failed to proffer any legitimate justification for his analytical approach undermines his conclusion that plaintiff's decline in sales to Neiman Marcus must have been a result of defendants' actions.

In their initial reports, both experts also assert in a conclusory fashion that they ruled out other possible causes of the decrease in plaintiff's sales to Neiman Marcus, such as the economy, declining customer interest, an impairment in the quality of either plaintiff's products or its delivery service to Neiman Marcus, or new business strategies by Neiman Marcus.[41] Notably, nothing in either expert's report indicates that they considered and controlled for the obvious possibility that plaintiff's sales to Neiman Marcus could have declined as a result of a decision by plaintiff to shift its resources to developing relationships with customers other than Neiman Marcus.[42] Indeed, Hansen

40. *Cf.* Defs.' Reply Mem. at 8 (arguing that damages experts' reliance on plaintiff's sales to Saks is misplaced); Schwartz Report at ¶ 11 (criticizing appropriateness of using Saks as a basis for projecting lost sales at Neiman Marcus).

41. Smith Report at 7 ("the economy, the potential shift of consumer preferences"); Hansen Report at 11 ("issues of product quality, delivery issues, changes in buying office personnel or direction, or insufficient sell through of RFMAS products").

42. This omission in Smith's and Hansen's analysis is particularly glaring in light of the data contained in Table 1 of Smith's report. The table shows that in 2002, RFMAS sales to

Neiman Marcus totaled $239,357, sales to Saks totaled $10,520, and sales to "other" totaled $33,020. By 2009, this balance had shifted dramatically; RFMAS sales to Neiman Marcus totaled $47,375, while its sales to Saks had grown to $3,031,656, and its sales to "other" totaled $5,374,680. Although Smith emphasizes that RFMAS's sales to Neiman Marcus declined each year after the alleged infringement in 2006, he does not discuss the fact that even before the alleged infringement, RFMAS' total sales grew dramatically each year, while Neiman Marcus accounted for a decreasing proportion of those sales (84% of total sales in 2002, down to 40% in 2005), while sales to Saks and "other" accounted for an increasing propor-

observed at his deposition that strategic choices, such as the sales inducements, advertising rebates, and unit prices offered to a retailer, can affect that retailer's purchasing decisions. (Hansen Dep. at 100–101). Yet neither expert looked at plaintiff's vendor agreements. (*See id.*).

More importantly, Smith's and Hansen's conclusory assertions that they ruled out some alternative causes of plaintiff's decline in sales to Neiman Marcus is belied by the record. Neither expert's initial report discusses any investigation into why Neiman Marcus reduced its purchases. Their depositions reveal that this is because they did none. Astoundingly, neither expert made any effort to ask representatives of Neiman Marcus why the

store stopped doing business with plaintiff before issuing his conclusion on what caused the disintegration of this relationship.[43] Smith did not even bother to read the deposition of Lisa Kazor, Neiman Marcus's witness. (Smith Dep. at 103). At any rate, plaintiff did not ask Ms. Kazor why Neiman Marcus decreased its purchases of plaintiff's jewelry (Defs.' Mem. Law at 6),[44] so reading the deposition would not have helped to foreclose alternative theories of causation. At their depositions, both Smith and Hansen claimed that if there were some reason for Neiman Marcus's reduced business with plaintiff other than defendants' wrongdoing, they would have expected to see evidence of this, but neither explained how the materials that they reviewed would have reflected these alternative causes.[45] Smith later conceded that

tion of plaintiff's total sales (sales to Saks were 3% of total sales in 2002 and 10% in 2005; sales to "other" were 11% in 2002 and 49% in 2005).

**43.** Smith Dep. at 97–98 ("Q: What efforts did you make to determine another explanation for the decline in sales to Neiman Marcus? A: I asked every place and everywhere and looked every place and everywhere I possibly could. Q: Did you ask Neiman Marcus? A: I did not."); *id.* at 98 (stating that, to investigate other possible causes for the decline in sales, he "clearly searched all the documents"); *id.* at 102 (responding to question about whether plaintiff could have lost the Neiman Marcus account because of a quality problem, a buyer change, or a personality conflict, that "You don't lose an account like this in which it's not visible, and I haven't seen it."); Hansen Dep. at 108–09 ("Q: Did you make any effort to inquire of Neiman Marcus as to why they stopped buying from the plaintiff? A: My report was developed on the—on the basis of evidence that I reviewed and it was presented to me by—by counsel. I did not have the opportunity to speak with Neiman Marcus directly.").

**44.** The parties have not provided the court with the entire transcript of Ms. Kazor's deposition. However, plaintiff has failed to identify any portion of it in which Kazor's testimony explicitly or implicitly ruled out the alternative causes that Smith and Hansen

claim to have considered. In addition, defendants proffered a portion of the deposition in which Kazor mentions a decline in sales of RFMAS jewelry at Neiman Marcus and plaintiff's counsel changes the subject rather than ask about the cause or effect of this decline. (*See* Kazor Dep. at 309).

**45.** *See* Smith Dep. at 96–97 ("I looked and tried to find some other explanation as to why this would occur, and I couldn't find any evidence that would explain any other reason why they were pushed out of [Neiman Marcus]. Every data point that I have, every single data point that I have says this (indicating) is the direct immediate cause for them to lose the entire account of Neiman Marcus, and there are no other reasons that I'm aware of."); *id.* at 193 ("[W]hen there are issues like that at the executive level I know about, I see emails; I'm able to see the specifics of what's occurring. I didn't see any of that here, nor did Steve Hansen. I didn't see any single document that indicate that—that—that there was conflict. I didn't see it. If there is, I'd love to see it, because maybe it's an alternative to this. But I didn't see anything. I didn't see an a single data point that explained any other reason why they lost the account, other than the actions that I laid out in my report."); *id.* at 194–95 ("Q: Do you believe there's anything going on at the customer level, the retail consumer level, that's causing sales to decline in Neiman Marcus?

his conclusions relied heavily on the assurances of plaintiff's counsel and Steve Hansen that they had ruled out alternative causes.[46] Given their lack of investigation, it is unremarkable that neither expert encountered any evidence that anything other than defendants' alleged wrongdoing caused Neiman Marcus to reduce its purchases of plaintiff's products.

In short, Smith's and Hansen's conclusion that there is no evidence of any alternative causes of the decline in sales to Neiman Marcus is simply a reflection of the fact that plaintiff did not provide them with any evidence pointing to alternative causes. Under these circumstances, Smith and Hansen cannot rely on the "absence of evidence" to rule out any alternative explanations. We note that Mr. Smith and Mr. Hansen need not necessarily have considered every alternative theory of causation advanced by defendants in order for their testimony to be admissible; if they had failed to consider one or even several of the obvious other possible causes, this might not be fatal to their testimony. But they did not simply fail to consider every plausible alternative cause—rather, the record lacks any evidence that Mr. Smith or Mr. Hansen actually investigated *any* other possible causes.

■ It is plain that one cannot determine whether something caused an observed effect without controlling for other equally plausible causes of that effect. As one court has observed, "[i]t is well settled that a causation opinion based solely on a temporal relationship is not derived from the scientific method and is therefore insufficient to satisfy the requirements of Fed.R.Evid. 702." *Awad v. Merck & Co.*, 99 F.Supp.2d 301, 304 (S.D.N.Y.1999) (internal quotations omitted). Since Smith's and Hansen's claims that they ruled out other possible causes are demonstrably false and their testimony that defendants' actions caused plaintiff's damages is based on little more than speculation, their analysis lacks the "intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152,

A: I don't know. I asked, and I wasn't able to find any problems. [...] I asked the attorneys. I asked the plaintiffs, both of them. I asked Steven Hansen. I looked at all the information, information provided by—by—by the plaintiffs, information provided by the defendants, and I didn't see any of that."); *id.* at 202 ("Every data point that I've seen indicates that customers were very happy and are very happy with RFMAS, very happy. And I know that, because it's still being rapidly sold by a whole range of highly reputable retailers everywhere except Neiman Marcus."); *id.* at 203 ("I do not have a single data point that their loss to Neiman Marcus was customer driven."); Hansen Dep. at 89 (stating that basis for his belief that defendants unseated plaintiff as a vendor to Neiman Marcus is "[t]hat I don't have evidence to contradict it. I've reviewed a lot of evidence in this case looking for other reasons why [...] the plaintiff's business was abruptly terminated" and that "if there were other reasons that this business rel'ship was disrupted, they would have [...] come out in the [...] evidence.");

*id.* at 92–3 (when asked about basis for his belief that "the identical nature of the products caused Neiman Marcus to stop purchasing RFMAS' products and substitute Mimi So products", responding, "I don't see any evidence to the contrary").

**46.** *Id.* at 97–98 ("Q: Why didn't you ask Neiman Marcus? A: [...] [O]ne of my sources to confirm what I saw is I spoke with Steve Hansen. And he did additional research beyond mine. And I said: Steve, have you seen any—have you seen any data point, any evidence anywhere? You reviewed the depositions of the Neiman Marcus people. You reviewed all this additional information that I haven't seen. Have you seen any data point that indicates that there's any other reason that RFMAS lost this account? And he said: No sir, I have not."); *id.* at 98–99 (stating that, to investigate other possible causes for the decline in sales, he asked Steve Crosby, Esq. and Steve Hansen if there were any documents that explain any other reason that they lost the account).

119 S.Ct. 1167. Theirs is plainly not a principled method of inquiry worthy of the court's respect; it leaves far "too great an analytical gap between the data and the opinion[s] proffered." *Joiner,* 522 U.S. at 146, 118 S.Ct. 512. Because their opinions on causation rest on an unreliable methodology, we recommend that the testimony of Don Smith and Steve Hansen on causation be excluded.

### 2. *Damages*

#### (a) *Smith Is Not Qualified to Make Financial Projections.*

Plaintiff has adduced no evidence that Mr. Smith is qualified to make financial projections. The qualifications listed in his report demonstrate that he is an expert in marketing. His listed experience suggests that he is practiced at manipulating a product's marketing or a company's sales strategy to increase revenues, but there is no basis on which to infer that he is knowledgeable about or experienced at making revenue projections. Simply put, understanding how to increase sales is different from understanding exactly how sales will increase, and plaintiff has given us no basis for believing that Smith understands the latter. He is not qualified to offer a calculation of plaintiff's lost sales, profits, or the diminution in plaintiff's brand value, intellectual property value, or enterprise value.

#### (b) *Plaintiff Has Failed to Demonstrate that the Methodologies that Smith and Hansen Employ to Calculate Damages Are Reliable.*

Defendants argue that Smith's and Hansen's testimony is based on an extremely limited set of facts, and that neither expert's analysis connected the particular circumstances of this case to their chosen methodologies. Defendants further argue that many of Smith's and Hansen's choices—including their selection of a growth curve, their decision to project lost sales through 2013, their decision to use a flat 5% annual discount rate to calculate the present value of money, and their method for calculating enterprise value—are poor choices, either because they are not generally accepted accounting methods or because those methods are not appropriately applied to the facts of this case.

Regardless of whether or not Smith's and Hansen's accounting methodologies might conceivably be justified in some circumstances, we agree that both experts have utterly failed to justify their chosen methodologies in light of the facts of this case. The minimal data that Smith and Hansen relied upon and plaintiff's clear failure to demonstrate that its damages experts' testimony rests on sufficiently reliable factual and methodological bases provide ample reason to exclude their testimony on damages.

As we noted earlier, Smith's entire calculation of damages is based on five points of data from the record: plaintiff's actual sales to Neiman Marcus in 2002 through 2006. Nowhere else in his quantification of plaintiff's damages does he draw on and apply any fact from the record. It is plainly not the case that no additional data would have been relevant to a determination of plaintiff's lost profits. Nonetheless, Smith and Hansen failed to do the investigation necessary to equip themselves with the information necessary to quantify plaintiff's damages.

Smith and Hansen fail to offer a satisfactory explanation rooted in the facts of this case for the many choices that they made in quantifying plaintiff's damages from defendants' actions. For example, Smith selected an "incremental profit rate" to determine plaintiff's lost profits from its lost sales, but failed to consider any of plaintiff's actual costs or its historical profit margin. In addition, the experts' determination of plaintiff's "enterprise value"—the piece of the damages calculation that

Hansen generated—is equally devoid of justification in the factual record. In Hansen's initial report, he provided no explanation at all of how he calculated that plaintiff's enterprise value had decreased by $26 million, apart from a vague indication that he had derived this figure by multiplying some unspecified number by some other unspecified number.[47] At his deposition, Hansen stated that enterprise value is generally six times a company's EBDA, but did not bother to substantiate this claim.[48] Puzzlingly, although he described the $26 million figure as the amount by which the enterprise value of RFMAS had been "diminished" (Hansen Report at 3), he apparently did not calculate the diminution by estimating the enterprise value before and after defendants'

alleged wrongdoing and subtracting the latter from the former. (*Accord*, Riley Report at 23–24 ¶ 60). Even more confusingly, despite Hansen's statement at his deposition that the use of a 6x multiplier was generally accepted, he applied a 5x multiplier in his supplemental report. (Hansen Suppl. Report at 1). He never explained the discrepancy or why one or the other might be more or less appropriate to the facts of this case, apart from referring to the 5x multiplier as "conservative". (*Id.*).

To the extent that either expert attempts to justify his choices at all, the proffered justification in almost every instance is a comment that the choice is "conservative"[49] or that it is "reasonable" or "common" as a general matter.[50] How-

---

**47.** *See* Hansen Report at 10 (stating that the enterprise value of plaintiff's business was "diminished by a market valuation multiple of the discounted value of the cash flows produced by the revenue stream of the business opportunity lost to infringement.").

**48.** Hansen Dep. at 156 (stating that, to calculate enterprise value, he would take "[t]he earnings before interest, taxes, depreciation and amortization, times a six times multiple, which is a fairly common discounted cash flow multiple for the future.").

**49.** Smith Report at 11 (describing choice of linear trend line as "conservative"); *id.* at 13 ("To be conservative, I only assumed lost sales for a five-year period." (citing telephone conversations with plaintiff's principals)); *id.* ("To calculate incremental profit, I used a conservative 36% of sales." (citing telephone conversation with Steve Hansen)); *id.* ("To define the present value of lost profit, I used a conservative 5%. Prime rate on 8/26/09 was 3.25%. A common guideline is to use 1% over prime. Thus, a 5% discount for future profits is conservative. The prime rate in 2007 was 8.1% and 5.1%. Thus, a 5% discount for historic profits is also conservative."); Hansen Suppl. Report at 4 (describing four-year projection of future lost sales as "conservative"); *id.* (describing use in this case of 5x multiple of earnings paid in similar small to middle market transactions as "a

very conservative assumption and below what a prospective buyer would expect to pay for a company such as RFMAS.").

**50.** Smith Report at 11 ("The use of such trend lines are commonly used by marketing professionals to forecast sales."); *id.* at 11 ("The use of such trend lines are commonly used by marketing professionals to forecast sales."); *id.* at 12 n. 32 ("It is very common practice to use trend lines on historic sales to forecast future sales. For example, these graphs were created on a standard feature of Microsoft Excel."); *id.* at 17 n. 46 (same); *id.* at 17 ("The use of trend lines to forecast sales is very common practice for marketing professionals."); Smith Dep. at 221 (describing exponential model as the "classic new product growth curve", and "very common"); Hansen Suppl. Report at 2 (describing his method of determining enterprise value as a "standard valuation technique" and a "common enterprise value technique", and noting that he employed "the approach we commonly use to make value determinations in purchase and project analysis."); *id.* ("In my experience of actively selling and acquiring numerous jewelry companies during the last 22 years, it is common practice to establish a four year or longer expectation of the concern By discounting the expected profits of future periods, one commonly establishes the value of those rights in the present period. In the

ever, the admissibility of Smith's and Hansen's testimony as to damages is not saved by either the fact that their approach to calculating damages might be appropriate in many other cases or the fact that their estimate of damages may actually understate the true extent of damage suffered by plaintiff.

For example, Smith justifies his choice of a linear, rather than an exponential, curve to project plaintiff's future sales based on historical sales data by noting that it is "conservative," which he explains as follows:

> This linear trend line is conservative for the following reasons:
>
> 1. New products often grow at a constant % change/year (exponential) rather than at a constant $ change/year (linear). For example, the best fit line for Saks' sales is better described by an exponential curve, not a linear curve. The best fit line to [plaintiff's] sales to the other retailers fits the same pattern. As can be seen in the examples in Graph 7, the forecast from a best-fit linear trend is less than the forecast for the best-fit exponential trend.[51]
>
> 2. Neiman Marcus' estimate sales [of RFMAS products] in 2013 is only $3,234,000 (Table 3). This is only 7% more than Saks' sales in 2009 (Table 3).

(Smith Report at 12–13 (emphasis in original)). This explanation is plainly inadequate to satisfy *Daubert* standards. In this explanation, Smith claims that the use

of an exponential model is generally accepted for forecasting sales of "new products" generally, without identifying what type of new products it is generally used for (until his deposition, when he explained that it is commonly used to predict the success of a "mom and pop restaurant"), and without explaining why one should expect sales of plaintiff's jewelry to trend similarly. More significantly, after setting forth the beginnings of a justification for use of an exponential model, Smith then rejected that approach in favor of a linear model that yields lower forecasts of future sales. It is troubling that the only fact in this case that Smith seemed to draw on to justify his decision to project future sales by applying an exponential curve based on five pieces of data is that the Stella line is arguably "new" and that this approach is often used to predict future earnings of new restaurants. *See Joiner*, 522 U.S. at 146, 118 S.Ct. 512. But it is vastly more problematic that his sole justification for the use of a linear model is that it yields an estimate of future sales that is "less than" the forecast yielded by the exponential method.

■ If Smith and Hansen had adequately supported their claims that various aspects of their analysis were "reasonable" or "common", this might demonstrate that they were using a methodology that was generally accepted as valid. However, in order for an expert's opinion to be admissible, the expert must have arrived at it by

---

jewelry business it is common for the vendor supplier relationship to last many years. I believe a four year projection is conservative and reasonable under the circumstances.").

**51.** Graph 7A is labeled "Trend line of sales to Saks (all products)". It appears to reflect plaintiff's actual sales to Saks in 2002 through 2008, and then projects sales in 2009 by overlaying onto this data two alternative projection models: an exponential curve that projects sales of approximately $3,000,000 in

2009, and a best-fit line that projects sales of approximately $1,750,000 in 2009. Graph 7B is labeled "Trend lines of sales to other retailers (all products)". It appears to reflect plaintiff's actual sales to unspecified retailers in 2002 through 2008, and to project plaintiff's sales to those retailers in 2009 by means of both an exponential curve, which projects sales of approximately $6,000,000, and a linear curve, which projects sales of approximately $3,500,000. (*See* Smith Report at 12 (Graphs 7A and 7B)).

means of a methodology that is not only valid as a general matter, but also appropriate given the facts of the case to which it is being applied, and it is incumbent upon the party offering the expert's testimony to demonstrate that the testimony satisfies these standards. Although plaintiff may have made conclusory assertions that go to the general validity of the accounting principles employed by Smith and Hansen, they make no effort at all to justify the application of those principles to this case in particular. As Ms. Riley explained,

> I agree with Mr. Smith that it is a common practice to use historical sales trends to forecast future sales. However, his projection of future lost revenue is nothing more than a graphing exercise performed by Microsoft Excel and fails to account for numerous factors that would impact the accuracy of his projections.

(Riley Report at 14 ¶ 34). Put another way, if an expert arrives at an estimate of damages by arbitrary means not connected to the facts of the particular case at hand, then the estimate is inadmissible, notwithstanding that it may be a perfectly appropriate means of estimating damages in some cases with different facts or that the estimate is lower than the estimate that would result from a carefully reasoned calculation.

Indeed, we note that the fact that many of the methods Smith employed are "conservative" may actually underscore the fact that they are not appropriate to the facts of this case, although this observation is not necessary to our conclusion that Smith's and Hansen's testimony ought to be excluded. Hansen endorsed Smith's estimate as "conservative" and "reasonable"[52] even while suggesting that a more accurate methodology would have yielded a "substantially" higher estimate and criticizing Smith's assumptions about the growth rate of the Stella line, the period of time over which the Neiman Marcus relationship could have lasted, and the collateral effects of the lost relationship not accounted for in Smith's model. The errors that Hansen identifies in Smith's analysis are relevant to the admissibility of Smith's testimony; the fact that Smith's estimate of damages was erroneously low rather than erroneously high is not. Unfortunately, Hansen chose to endorse Smith's "conservative" calculation of damages and emphasize that Smith's recommended award of $5.2 million in lost profits would be a bargain rather than putting his expertise and effort into the creation of an independent and more appropriate calculation of damages.

In sum, plaintiff has not demonstrated by a preponderance of the evidence that Smith's or Hansen's quantification of plaintiff's damages is the product of an accounting methodology that is appropriate in light of the particular facts of this case. Their calculations of damages are accordingly inadmissible. Plainly, neither Smith's nor Hansen's report satisfies their obligation to explain the factual basis for their damages calculations, and their depositions and supplemental reports give us no reason to believe that either expert's testimony would be any more transparent at trial. Accordingly, for this reason, the portions of Smith's and Hansen's reports quantifying damages should be stricken and they should be precluded from testifying on this subject at trial.

### IV. PLAINTIFF'S LIABILITY EXPERTS

#### A. Joyce Jonas

Joyce Jonas is a self-described "expert in jewelry and jewelry history". (Joyce Jonas Report, Sep. 15, 2009, Ex. 3 to Richard Lehv, Esq. Decl., Dec. 1, 2009 ["Jonas

---

52. *E.g.,* Hansen Report at 17.

Report"] at 1 ¶ 1). Her company specializes is "antique, period, estate and fine jewelry appraisals". (*Id.*). Her curriculum vitae reflects that she is knowledgeable about jewelry from the 19th and early 20th centuries (specifically, jewelry in the Georgian, Victorian, arts and crafts, Art Nouveau, Edwardian, and Art Deco styles) and about diamonds. (Ex. A to *id.* at passim). She stated in her report that she "routinely review[s] the developments in the world of jewelry design in various ways such as through industry publications (InStore, Jeweler's Circular Keystone, etc.), internet searching, trade shows, and store visits." (*Id.* at 1 ¶ 3).

Plaintiff hired her to "evaluate the plaintiff's Stella jewelry for its probable effect in the market, especially its trade dress' ability as a source identifier"; to identify the "relevant similarities and differences" in the design of plaintiff's and Mimi So's jewelry; to evaluate whether customers are likely to be confused about the source of defendants' jewelry; and to evaluate whether defendants' jewelry could have been copied from plaintiff's jewelry. (*Id.* at 2 ¶ 9).

Ms. Jonas based her opinions primarily on materials provided to her by plaintiff: photographs of the parties' jewelry, as well as actual samples of some of the parties' jewelry; the complaint and answer; the parties' websites; and marketing materials, including the Neiman Marcus ads for plaintiff's and Mimi So's jewelry. (*Id.* at 2–3 ¶¶ 10–11, 13–14). She also relied on plaintiff's representations that "plaintiff's sales at Neiman Marcus declined after defendants launched the allegedly infringing jewelry at [Neiman Marcus] in 2006, from a peak of over a million dollars to very little now; plaintiff's sales at [Saks] Fifth Avenue, where the allegedly infringing jewelry is not sold, continued to rise and skyrocketed this year." (*Id.* at 2 ¶ 12). Ms. Jonas stated that she performed additional independent investigation, although she was vague in her initial report about the nature of these efforts.[53] At her deposition, she testified that she had made some effort to find prior art by searching the internet and reviewing unspecified books, catalogs, and magazines for a necklace with a twisted link that predated plaintiff's piece. (Joyce Jonas Dep., Oct. 5, 2009, Ex. 7 to Richard Lehv, Esq. Decl., Dec. 1, 2009/Ex. 3 to Kenneth Feldman, Esq. Decl., Dec. 18, 2009 ["Jonas Dep."] at 12).[54]

### 1. *Jonas' Findings: Trade Dress*

Ms. Jonas opined in her expert report that "the purchasing public sees plaintiff's distinctive combinations of twisted and different-sized links in the Stella jewelry as a trade dress." (*Id.* at 4 ¶ 19).[55] She ex-

---

**53.** She noted in her report that she "researched the designs and the parties at issue on the Internet" and "further researched the parties and the designs at issue in stores to assess the similarities in the parties' items of jewelry and the collections at issue." (*Id.* at 2 ¶ 11).

**54.** Pages 12, 28–29, 59–67, 80, and 83 of Ms. Jonas' deposition are available at Exhibit 3 to the Feldman Declaration. Pages 81–84 are available at Exhibit 7 to the Lehv Declaration.

**55.** The Supreme Court has explained that the " 'trade dress' of a product is essentially its total image and overall appearance. It 'in-

volves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques.' " *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 765 n. 1, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (quoting *Blue Bell Bio–Medical v. Cin–Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir.1989); *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir.1983)). Black's Law Dictionary defines "trade dress" as "the overall appearance and image in the marketplace of a product or a commercial enterprise. For a product, trade dress typically comprises packaging and labeling. For an enterprise, it typically comprises design and

plained: "I conclude this for a variety of reasons, including the character of the designs themselves, the marketing, and the sales of the design." (*Id.*).

Ms. Jonas also expressed the opinion that plaintiff's Stella jewelry line was distinctive. She stated that "chains of circular links have long been used in jewelry design but to my knowledge never quite like this." (*Id.* at 4 ¶ 20). She described the links in plaintiff's allegedly infringed large-link necklace as having a "natural twist" (*id.* at 3 ¶ 18) and combining to "form a loose chain pattern that is unique to each piece but still recognizable with the same distinctive look. The pieces are unique in their use of these and other elements." (*Id.* at 3–4 ¶ 18). She observed:

> No one can know for certain who started this trend to gold link jewelry, but [plaintiff's] pieces were at the forefront. I recall the combination of elements created a real twist in the overall designing and popularity of gold link jewelry due to the way the natural twist in the links and other elements were combined.

(*Id.* at 4 ¶ 23). She added that:

> This iconic look in the Stella Collection, which uses the same overall feel in numerous configurations, including necklaces, bracelets and earrings, is widely known as being from one design source, Faraone Mennella. I have seen numerous pictures, mentions, and advertisements of it in top magazines, such as The Book (by Neiman Marcus), Town & Country, Vogue, and In Store.

(*Id.* at 4 ¶ 21).

She added that "word of the Faraone Mennella Stella Collection design spread rapidly starting about 2004." (*Id.* at 5 ¶ 26). She stated that this fact was evident from the publication of an unspecified Time Magazine article that came out "a few years" after 2004, in which plaintiff's design was named "one of the top designs of the year", and from the fact that plaintiff's sales, she was told, "accelerated from its inception up until the alleged infringement." (*Id.*).

### 2. *Jonas' Findings: Similarities and Differences, Likelihood of Confusion*

Ms. Jonas testified that the parties' jewelry designs were similar, employing both the same elements—"different sized ovals or circular links with or without a twist"—and the same "design as a whole", meaning the same overall "shape and configuration". (*Id.* at 5 ¶¶ 30, 34). She noted two relevant differences between the parties' jewelry. First, while plaintiff's links were smooth and twisted, defendants created the same "feeling of movement" conveyed by the actual twists in plaintiff's design through the use of faceted links. (*Id.* at 6 ¶ 31). At her deposition, she explained that, by "faceted", she meant that each of defendants' links had "little cuts in the metal that give it another dimension". (Jonas Dep. at 59). Second, defendants' pieces had diamonds. (Jonas Report at 6 ¶ 32). At her deposition, she identified a few other relevant differences in the parties' large-link necklaces: the color of the gold used, the finish (plaintiff's links were matte, defendants' were shinier), and the method of manufacturing the links (plaintiff's links were hollow tubes, while defendants' were solid and made by cast). (Jonas Dep. at 62–63, 67). She also observed at her deposition that plaintiff's allegedly infringed earrings used a teardrop-shaped link, while defendants' did not, and that there was "a very strong difference" in the

---

decor. If a trade dress is distinctive and nonfunctional, it may be protected under trademark law."

finish used in the parties' earrings. (*Id.* at 63–65).

She also testified that there was "no doubt in [her] mind" that consumers would likely be confused about the source of defendants' jewelry. (*Id.* at 7 ¶ 36). She opined that laymen would not notice defendants' "added flourishes" because the average person tends to view pieces as a whole, and to notice only the "overall effect of the core designs"; they do not have the concepts or terminology necessary to observe fine details. (*Id.* at 6 ¶ 33).[56] She noted that if she observed them from a short distance, even she would be fooled into thinking they were Faraone Mennella designs. (*Id.* at 6 ¶ 32). At her deposition, she added that she had heard from plaintiff's attorney that when Mimi So's Gate B9 line debuted, vendors called plaintiff to ask if Faraone Mennella was now in business with Mimi So. (Jonas Dep. at 82). She observed, "If the vendors were confused, I would imagine that the general public is even more confused, since they know less." (*Id.*). She conceded at her deposition that she had not consulted any vendors or consumers before reaching the conclusion that consumers were undoubtedly confused about the source of defendants' jewelry. (*Id.*).

### 3. *Jonas' Findings: Likelihood of Infringement*

Jonas found that the "number and scope of the similarities between the parties' pieces in this context are [too] great to be happenstance, or merely following a trend." (*Id.* at 7 ¶ 34). She determined that defendants must have copied plain-

tiff's design, based on two considerations. First, plaintiff designed the Stella line before Mimi So designed the Gate B9 collection. (*Id.* at 7 ¶ 35). Second, the placement of the diamonds on defendants' works was, in her professional opinion, "too awkward" to be a legitimate design choice; rather, she opined that the "out-of-place" diamonds on defendants' pieces reflected defendants' desire to cover up the fact that they had copied plaintiff's design. (*Id.* at 6 ¶ 32).

### B. *Edward Lewand*

Edward Lewand is an experienced jewelry appraiser. (See Edward Lewand Report, Sep. 15, 2009, Ex. 4 to Richard Lehv, Esq. Decl., Dec. 1, 2009 ["Lewand Report"] at 8–10 ("About the Appraiser"); *id.* at 12–13 (curriculum vitae)).[57] In 1989, he published an article on "radioactive synthetic gemstones" in "Gems & Gemology", but he has not published anything since then. (*Id.* at 9).

Plaintiff hired him to offer his testimony on the same issues as Ms. Jonas. (*See id.* at 1–2). He based his report on the materials provided to him by plaintiff, which were the same as the materials provided to Ms. Jonas. (*Compare* Lewand Report at 14 (appendix listing materials reviewed) *with* Ex. B to Jonas Report (same)). Like Ms. Jonas, Mr. Lewand was able to view some physical pieces of jewelry from both plaintiff and defendants, but he stated in his report that he did not believe the pieces produced by defendants to be the same pieces depicted in the available photographs of defendants' jewelry. (Jonas

---

**56.** Although she did not specify in her report what "flourishes" were beyond the grasp of the ordinary viewer, we infer that she was referring to the faceting of defendants' links and the diamonds that Ms. Jonas testified that defendants added to obscure their "duplication" of plaintiff's design. (*Id.* at 6 ¶ 32; *see also* Jonas Dep. at 80 (stating that laypersons "don't necessarily see the details, or they

don't catch the faceting in one or small diamonds in that."); *id.* at 83–84 (stating that consumers "might not know that it's a twist," but that "they'll notice the movement.")).

**57.** He noted in his report that he is also a paralegal at Adelphia University of New York and a licensed insurance broker. (Lewand Report at 9).

Report at 7–8). He thus decided to base his testimony solely on the photographs of defendants' jewelry, and not on his examination of exemplars of defendants' jewelry. (*Id.* at 8). He stated that he was reserving the right to modify his opinion in the event that he was able to examine true exemplars of defendants' infringing jewelry. (*Id.*).

### 1. *Lewand's Findings: Trade Dress*

Mr. Lewand testified that plaintiff's Stella line took elements of different existing designs and combined them into a series of unique designs. (*Id.* at 3). He opined that plaintiff's large-link necklace, with links of different sizes and shapes "placed in a complex arrangement" [58], is "especially" distinctive, because other designers had previously made chain necklaces with "a set and visually simple repeating pattern". (*Id.* at 5). He noted that plaintiff's jewelry line had received "widespread publicity", as evidenced by the collection of print advertisements and press materials that he had viewed. (*Id.* at 6).[59] Based on the distinctiveness of the Stella designs, the publicity the line received, and the "level of sales" [60], Lewand concluded that, in his opinion, "the public recognizes the combination of design elements in these pieces as a symbol or a

trade dress of Faraone Mennella." (*Id.* at 6).

Lewand stated that he had read plaintiff's trade-dress description, as described in plaintiff's supplemental interrogatory response number 5, and that it "accurately defines the distinctive combination of elements of the Stella line." (*Id.*).

### 2. *Lewand's Findings: Similarities and Differences, Likelihood of Confusion*

Mr. Lewand opined that plaintiff's Stella jewelry line and Mimi So's Gate B9 collection were similar in that the pieces in both jewelry lines share "a parallel layout and overall design" (*id.* at 4), and convey an "illusion of movement". (*Id.* at 3). He noted several differences: the use of different colors of gold, different textures, different ordering of the links, and Mimi So's faceting of the links, use of tear-shaped links, and addition of small diamond and gem accents. (*Id.* at 4–5). However, he concluded that these did not change the fact that the "the overall appearance" of the Mimi So line is "identical" to that of plaintiff's jewelry line. (*Id.* at 4).[61] He opined that, in fact, one of these differences—Mimi So's use of tear-shaped links—actually contributed to the similarity between the parties' jewelry lines.[62] In Mr. Lewand's opinion, defendants simply

---

58. We infer that he is referring to RFMAS item number # N01L, which Lewand testified was infringed by Mimi So item number B9NGYG0000627. (*See* Lewand Report at 7).

59. Specifically, Mr. Lewand cited "Exhibit 76–78 to the Declaration of Steven Crosby". (Id.). We infer that he is referring to plaintiff's exhibits in support of its motions for summary judgment, filed on August 11, 2008. As I noted in a recent opinion in this case, plaintiff does not seem to have formally filed these exhibits with the court. (See Mem. & Order, Aug. 10, 2010, at 5 n.8). Nonetheless, I have reviewed courtesy copies of these exhibits, and they appear to contain assorted marketing materials and press clippings about RFMAS's Stella line.

60. Mr. Lewand did not explain what he understood the "level of sales" to be, nor did he cite any materials that he had viewed that reflected sales of RFMAS's Stella line.

61. *See also id.* at 3 (plaintiff's jewelry and the corresponding Mimi So jewelry "appear to be identical"); *id.* at 4 ("Mimi So Gate B9 designs [...] in my opinion, are identical to RFMAS' designs in their overall look, feel and expression, differing only in texture and accent."); *id.* ("the overall appearance is identical").

62. *Id.* at 5 ("Indeed, Mimi So Gate B9 pieces have oval and tear-shaped links which give the appearance they are of the Stella line, or at least of the same designer").

achieved the illusion of movement "inherent" in plaintiff's designs in new ways. (*Id.* at 3; *see also id.* at 3–4). Thus, he concluded, the public would be confused about the source of the jewelry. (*See id.* at 3, 4, 5).

### 3. *Lewand's Findings: Likelihood of Infringement*

Mr. Lewand concluded that defendants had indeed infringed plaintiff's copyright. This conclusion was apparently based on his perception that the parties' pieces were very similar, and his opinion that the few differences between the Stella and Gate B9 lines were merely the result of defendants attempting to mask the fact that they had copied plaintiff's jewelry. (*See* Lewand Report at 5–6). He explained, "The evidence of copying is overwhelming when I compare all nine corresponding pieces. I have never seen two collections of pieces like this in my career that mirror each other so closely in overall design choices yet are purported to be independent." (*Id.* at 7).

### C. *Analysis*

#### 1. *Trade Dress, Consumer Confusion*

The question with respect to trade dress that plaintiff presented for Ms. Jonas's and Mr. Lewand's consideration is ambiguously worded and unclear, and appears to encompass several questions of law, fact, and opinion.[63] In support of their conclusion that plaintiff's Stella line is a protectable trade dress, Jonas invokes "the character of the designs themselves, the marketing, and the sales of the design", and Lewand invokes "publicity, the level of sales, and the distinctiveness of the designs of the Stella pieces",[64] but

neither explains how any of these three considerations supports his or her conclusion.

▮ To the extent that Jonas and Lewand purport to offer opinions as to what constitutes protectable trade dress or attempt to apply that legal standard to the facts of this case, their testimony usurps the role of the fact-finder and is clearly inadmissible. *E.g., Highland Capital Management, L.P. v. Schneider*, 379 F.Supp.2d 461, 468 (S.D.N.Y.2005) (citing *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir.1999); *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir.1991)).

▮ If, on the other hand, their testimony as to trade dress boils down to the opinion that plaintiff's Stella line is identifiable to consumers and "distinctive", it is nonetheless inadmissible because plaintiff has failed to demonstrate that Ms. Jonas and Mr. Lewand are qualified to offer expert testimony on these matters. Neither putative expert's listed qualifications demonstrate that either of them has any specialized knowledge, training, or experience in understanding how the public perceives jewelry, or even products, generally. In addition, neither expert appears to have any specialized knowledge of contemporary jewelry design. Although both are qualified to opine on the value and quality of precious stones, and Ms. Jonas is an expert in the design of estate jewelry, they both lack the comprehensive design background necessary to opine that plaintiff's jewelry line is "distinctive" or "unique" in the history of jewelry.

**63.** Jonas Report at 2 ¶ 9 ("Among other requests, Plaintiff's counsel requested that I 1) evaluate the plaintiff's Stella jewelry for its probable effect in the market, especially its trade dress' ability as a source identifier"); Lewand Report at 1–2 ("Plaintiff's counsel requested that I: 1) evaluate the Plaintiff's

Stella jewelry for its probable effect in the market, especially its trade dress' ability to function as a source identifier").

**64.** Jonas Report at 4 ¶ 19; Lewand Report at 6.

 Moreover, their reports do not set forth sufficient analysis to support their conclusions. Plaintiff has not demonstrated that these putative experts' opinions about trade dress and consumer confusion rest on a sufficiently reliable methodological basis.

First, although Jonas and Lewand purport to assess the distinctiveness of plaintiff's entire Stella line,[65] their reports do not indicate that they examined the entire jewelry line. In fact, their reports indicate that their understanding was that only nine pieces of plaintiff's jewelry had been infringed. (Jonas Report at 7 ¶ 34 (referring to examination of "the nine jewelry pieces of Plaintiff's at issue"); Lewand Report at 7 ("The evidence of copying is overwhelming when I compare all nine corresponding pieces.")). Without clarifying their assumptions about which pieces of plaintiff's jewelry they were supposed to be analyzing and explaining why an examination of nine pieces provides a sufficient basis on which to opine about the line as a whole, their testimony that plaintiff's jewelry is distinctive and constitutes a trade dress is little more than conclusory say-so that cannot be tested by the jury.

Second, both putative experts failed to explain the basis for their conclusion that plaintiff's jewelry is unique and thus protectable. Neither one discusses the level of sales at all, and their discussions of marketing amount to little more than the observation that plaintiff did advertise its jewelry. Additionally, neither pinpoints with any degree of precision what, in their opinions, makes plaintiff's chain of circular links "distinctive" among gold link jewelry. Lewand came closest to supporting his conclusion that plaintiff's jewelry was distinctive with his claim that prior designers had previously made chain necklaces with "a set and visually simple repeating pattern", but he failed to explain what this

means and why plaintiff's pieces do not also fit this description, and he did not cite any such prior designs to help the jury understand, much less evaluate, this conclusion. Apart from this identified difference, his conclusion that plaintiff's line is "especially" distinctive is as conclusory as Ms. Jonas's.

Finally, even if Jonas and Lewand improved their articulation of the basis for their opinions, they do not rest on a sufficiently reliable basis, given that neither expert engaged in any kind of methodical search for prior art. (See Defs.' Mem. Law at 18–19). It appears that Mr. Lewand did no investigation into the existence of gold link necklaces predating plaintiff's. (See *id.*). And although Ms. Jonas claimed at her deposition to have searched the internet and unspecified books, catalogs, and magazines for prior gold link necklaces (Jonas Dep. at 12), she did not disclose the extent and details of her search or specify its results. She would have us take her word as to the sufficiency of her investigation, which we are not permitted to do under *Daubert* and the Federal Rules of Evidence.

On the whole, both Jonas' and Lewand's testimony that plaintiff's jewelry is distinctive requires us to accept their conclusions on faith by virtue of their expertise. However, the Federal Rules of Evidence require more from expert witnesses. And, in any event, as we observed above, their expertise does not qualify them for this particular task.

### 2. *Similarities and Differences*

Defendants argue that jurors are capable of recognizing and understanding the differences and similarities between plaintiff's and defendants' jewelry without the help of an expert, and thus, that Ms. Jonas' and Mr. Lewand's testimony on this

---

65. Jonas Report at 2 ¶ 9, 4 ¶ 19, 4 ¶ 21; Lewand Report at 1, 6.

question does not satisfy Federal Rule of Evidence 702. On that point we disagree.

 In copyright infringement cases, liability experts may opine as to similarities that are probative of copying if their testimony will aid the trier of fact in understanding the evidence. *See Castle Rock Entm't v. Carol Publ'g Group*, 150 F.3d 132, 137 (2d Cir.1998). Although expert testimony as to similarity is not appropriate in every case, jewelry design is a sufficiently technical area that not every juror will be well-equipped to identify the similarities between two designs on his or her own; accordingly, a trained eye could assist the trier of fact in understanding the evidence.[66] Testimony on this topic by qualified experts is admissible.

In addition, although Jonas and Lewand may not have the design background necessary to comment on how plaintiff's jewelry fits into the landscape of contemporary jewelry as a whole (as we explained above), we believe that their years of experience working with jewelry may give them an ability to observe subtle and significant differences and similarities among pieces of jewelry that is superior to that of the average juror. They are thus likely to be able to offer testimony on this matter that would be helpful to the jury. Because defendants have not challenged these experts' method of comparing jewelry or the basis for the comparison, their testimony on this topic may be admissible. *See* Fed. R.Evid. 702.

### 3. *Likelihood of Infringement*

Ms. Jonas' and Mr. Lewand's opinions that defendants' jewelry was likely the result of copying plaintiff's designs should be excluded because they are not qualified to opine on this matter and because their conclusions do not rest on sufficiently reliable analysis.

Both putative experts reach the conclusion that defendants must have copied plaintiff's jewelry, and rely for this opinion on the perceived similarities between the two lines and the distinctiveness of plaintiff's line. However, as we explained above, neither expert is qualified to opine on the contemporary jewelry design landscape as a whole.

In addition, plaintiff has failed to demonstrate that their testimony as to the likelihood of infringement is the result of applying sufficiently reliable methods to a reliable set of facts. As we explained above, neither expert's testimony that plaintiff's line is distinctive is supported by sufficient analysis. Moreover, as defendants point out, neither putative expert distinguishes between similarities that relate to plaintiff's "distinctive" design elements and similarities that relate to unprotectable ideas and commonplace jewelry forms. (Defs.' Mem. Law at 18).

Jonas' and Lewand's explanation for concluding that defendants infringed plaintiff's intellectual property boils down to the observations that plaintiff's and defendants' jewelry lines are similar in many ways and that plaintiff's preceded defendants'. As for the various differences that both experts identified between plaintiff's and defendants' lines, they attempt to explain these away by asserting in a wholly conclusory fashion that these differences are merely the result of defendants trying to cover up their infringement. This is entirely speculative, and is plainly an inad-

---

**66.** *Cf. Price v. Fox Entm't Group, Inc.*, 499 F.Supp.2d 382, 389 (S.D.N.Y.2007) (expert testimony as to the probative similarities between screenplay entitled "Dodgeball: The Movie" and production and distribution of movie entitled "Dodgeball: A True Underdog Story" was inadmissible because copyrights in question were not highly technical works and the jury was capable of recognizing and understanding the similarities between the works without the help of an expert).

equate basis on which to discount the differences between the jewelry lines. Ms. Jonas added that, in her opinion, the stylistic elements of defendants' jewelry that differ from plaintiff's are "too awkward" to be legitimate design choices and can only reflect a poor cover-up, without explaining what makes them awkward or why this is not equally consistent with defendants having a different aesthetic from plaintiff.

In sum, Jonas and Lewand again offer little to support their testimony as to copying other than their say-so. Their testimony on the likelihood of infringement is accordingly inadmissible.

## CONCLUSION

For the reasons above, we recommend that defendants' motion to exclude plaintiff's experts be GRANTED in part. We recommend that both Don Smith and Steve Hansen be precluded from testifying at trial as to whether defendants' actions damaged plaintiff and if so, to what extent. In the absence of any specific objection to Steve Hansen's testimony on the narrow issue of whether the jewelry featured in Mimi So's 2006 Gate B9 catalog "would only be sold precisely as it is depicted" (Hansen Report at 6; see supra at 255 n. 4), we recommend that this limited portion of his testimony be deemed potentially admissible. The entirety of Smith's expert reports and the relevant portions of Hansen's expert reports should accordingly be stricken.

We further recommend that Joyce Jonas and Edward Lewand be permitted to offer their observations about the similarities and differences between plaintiff's and defendants' jewelry. However, we recommend that they be precluded from offering expert opinions as to the "probable effect in the market" of plaintiff's Stella line, the distinctiveness of plaintiff's line, whether or not the Stella line operates as a source identifier and constitutes a protectable trade dress, whether customers are likely to be confused about the source of defendants' jewelry, and whether defendants' jewelry was copied from plaintiff's, and that the corresponding portions of their expert reports be stricken.

We note that to the extent that defendants' motion is denied in part, defendants would nonetheless retain the right to renew their objections at trial if in the course of examination they believe that specific expert testimony offered is unreliable or unsubstantiated. See *Park West Radiology*, 675 F.Supp.2d at 328.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to the Report and Recommendation portion of this opinion. See also Fed.R.Civ.P. 6(a), (d). Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Victor Marrero, Room 660, and to the chambers of the undersigned, Room 1670, U.S. Courthouse, 500 Pearl Street, New York, New York 10007. Failure to file the timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See *Thomas v. Arn*, 474 U.S. 140, 150–55, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), *reh'g denied*, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); *DeLeon v. Strack*, 234 F.3d 84, 86 (2d Cir.2000) (citing *Small v. Sec'y of Health and Human Serv.*, 892 F.2d 15, 16 (2d Cir.1989)).

Dated: New York, New York

August 30, 2010